BARBARA P., Appellant,

v.

STATE of Alaska, DEPARTMENT OF
HEALTH & SOCIAL SERVICES, Of-
fice of Children's Services, Appellee.

Leo S., Appellant,

v.

State of Alaska, Department of Health &
Social Services, Office of Children's
Services, Appellee.

Nos. S–13603, S–13606.

Supreme Court of Alaska.

July 9, 2010.

Christi A. Pavia, Pavia Law Office LLC, Anchorage, for Appellant Barbara P.

Jill C. Wittenbrader, Contract Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant Leo S.

Megan R. Webb, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee State of Alaska.

Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Guardian Ad Litem.

Before: FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

Barbara and Leo each appeal the superior court's judgment terminating their parental rights to their children, Michael and Gary, on the grounds of mental illness, domestic violence, substance abuse, and abandonment.[1] The parents challenge the superior court's admission of expert testimony during trial, its finding that the children were in need of aid, its finding that the parents had not remedied the conduct or condition that placed the children at risk, its finding that the State of Alaska Office of Children's Services (OCS) made reasonable efforts to reunify the family, and its finding that termination of parental rights was in the best interests of the children. Because the superior court's legal conclusions were correct and its factual findings were not clearly erroneous, we affirm the judgment in all respects.

## II. FACTS AND PROCEEDINGS

Barbara and Leo are the parents of Michael and Gary. Michael was born on August 1, 2006 and has been living in foster care or with relatives of Barbara since December 2006. Gary was born on April 14, 2008 and has been living in foster care his entire life. Michael and Gary are currently living with the same foster parents, who have stated an intent to adopt the children should Barbara's and Leo's parental rights be terminated.

### A. Facts

#### 1. Barbara's history

Barbara was born in April 1988. As a child, she was exposed to parental substance abuse and was the victim of neglect and sexual and physical abuse. Barbara has a history of depression and suicidal behavior. As early as age six, Barbara threatened to kill herself. She attempted to commit suicide during her pregnancy with Michael and again when he was one year old. During a mental health assessment, she acknowledged that she had "slit her wrists 7–8 times." At trial, she testified that she had attempted suicide "[a] lot."

Barbara also has a history of substance abuse. At 12, Barbara began drinking alcohol; by 14, she had used marijuana; by 15, she had used Percocet and crystal methamphetamine; and by 16, she had used cocaine. Between the ages of 14 and 16, Barbara obtained several substance abuse assessments that recommended that she participate in substance abuse treatment programs. She was discharged from her first treatment program because she had a sexual relationship with another client in the program. She finished a second treatment program but relapsed before she even got out of treatment, using cocaine during the final month. While pregnant with Michael, Barbara used marijuana regularly and did not stop until the eighth month of her pregnancy. She took methadone before and after his birth.

#### 2. Domestic violence in Barbara and Leo's relationship

Barbara and Leo began a relationship in February 2005. Leo testified at trial that there was domestic violence in the relationship, describing at least one physical argument based on his jealousy and stating that he was "sure" he had left bruises on Barbara from their fights. Barbara testified that Leo had threatened to kill her and had strangled and choked her.

Barbara became pregnant with Michael in late 2005. When Barbara was four months pregnant, she attempted to commit suicide, explaining later that she was tired of being "beaten every day." When Michael was sev-

1. We use pseudonyms to protect the family's privacy.

eral months old, Barbara filed for a protective order in which she expressed fear for her and Michael's lives; described Leo's "constant abuse," including hitting her and pushing her mom; and explained that Leo is violent when he "is on any kind of drug." She was granted a temporary protective order but did not request a long-term order at the hearing that followed.

### 3. Michael's removal and placement in foster care

Michael was born in August 2006. On October 17 of that year, the State of Alaska, Office of Children's Services (OCS) took temporary custody of Michael after receiving a report that Barbara was using crack cocaine, and her mother, Jane, was using crack cocaine with Michael in the room. The investigating social worker visited the home in which Michael, Barbara, and her mother were living and witnessed Leo being removed from the home by officers who had served him a temporary protective order that Barbara had obtained from the court. Barbara verified to the social worker that Leo hit her and threatened her.

Although Barbara and Jane initially denied drug use to the social worker when they were interviewed together, Jane admitted separately that she had recently used cocaine, although not around her children or in the home. Prior to this cocaine use, Jane had been sober for ten years, and she attributed her relapse to her fear for her daughter's safety because of Leo. Both Barbara and Jane submitted to drug tests and tested positive for methadone. Based on the positive drug tests, Jane's recent relapse into cocaine use, ongoing domestic violence, and concern about Michael's safety, the social worker assumed custody of Michael and placed him temporarily into foster care. On October 24, 2006, the superior court issued a temporary custody order pending an adjudication hearing committing Michael to the custody of OCS and requiring the development of a case plan for Barbara and Leo.

### 4. Michael's return to Barbara and removal again several months later

After Michael was removed from her care in October 2006, Barbara moved out of her mother's house and into a domestic violence shelter. Approximately two and a half weeks later, Michael was returned to Barbara at the shelter. In late December, Barbara tested positive for cocaine use, and a "white powder substance" was found in her room at the shelter. As a result, Michael was removed permanently from her care, and she was required to leave the shelter. Michael remained in foster care briefly before being placed with a relative of Barbara.

In January 2007 Barbara and Leo stipulated to adjudication of Michael as a child in need of aid pursuant to AS 47.10.011(8) (domestic abuse) and AS 47.10.011(10) (substance abuse). Based on the stipulation, the superior court issued an order adjudicating Michael to be a child in need of aid and committing Michael to the continuing custody of OCS.

In July 2007 OCS received a report that Barbara and Leo were involved in a "domestic violence issue" at the home of the relative with whom Michael had been placed. At one point during the incident, Barbara picked up Michael to leave the home, and Leo slapped Barbara while she was still holding Michael. The day after the incident, a social worker and state trooper went to the home and, after finding Leo hiding in the back room, removed Michael from the home and placed him back in foster care.

### 5. Barbara's case plan

OCS developed a case plan for Barbara in late 2006, requiring that she obtain a substance abuse assessment and comply with its recommendations. After completing the substance abuse assessment in November 2006 with Alaska Family Services (AFS), Barbara was diagnosed with opioid abuse, alcohol abuse, sedative abuse, amphetamine dependence, and cannabis dependence. The assessment recommended an intensive outpatient substance abuse program, and Barbara was placed on the waiting list for treatment; she was dropped from the waiting list when she failed to attend two Alcoholics Anonymous (AA) meetings per week as required.

After she tested positive for cocaine use in December 2006 and Michael was taken into OCS custody, Barbara returned to AFS asking to be reinstated on the waiting list. Barbara was unable to begin substance abuse treatment through AFS because her mother was currently receiving treatment at the same facility, although she was provided with alternative options for treatment, including Ascent Treatment and Counseling.

Barbara tested positive for cocaine again in April 2007. In a meeting with a social worker, she denied using cocaine but admitted to selling cocaine during March and April because she could not find a job. Barbara participated in a new substance abuse assessment with AFS in May 2007. The assessment reaffirmed her dependency on and abuse of various drugs and again recommended intensive outpatient substance abuse treatment. She began substance abuse treatment through Ascent in August 2007. Barbara was at times inconsistent in taking her required urinalysis tests and tested positive for cocaine use again in October 2007, which she testified was the last time she used cocaine. At the time, she was pregnant with Gary.

Barbara's substance abuse assessment also recommended that she complete a full psychiatric evaluation. Barbara completed a psychological evaluation with Dr. Grace Long consisting of five meetings between March and May 2007.[2] Dr. Long concluded that Barbara should obtain intensive outpatient treatment for her substance abuse and recommended that she seek "long-term treatment for depression, possibly with psychotropic medications" and "participate[ ] in a dialectic/behavior therapy program" including "long-term individual therapy." Without such treatment, Dr. Long concluded that Barbara's "parenting skills [were] likely to remain unchanged and compromised." Dr. Long reiterated this recommendation at trial.

Barbara requested that she be allowed to see Megha Hammaker, a nurse practitioner whom she had seen before, as her mental health professional, and OCS approved of her request. At trial, Barbara testified that she had seen Hammaker at least every two weeks since February 2006 and spoke to her frequently. The superior court did not credit this testimony. According to Hammaker's own records and testimony, there were periods of months between visits and few phone calls. Barbara reinitiated counseling sessions with Hammaker after a ten-month lapse in August 2007, following a suicide attempt. She participated in three sessions and then stopped seeing Hammaker until February 2008, when Barbara resumed sessions for less than a month before missing another nine weeks. After Hammaker recommended in early June 2008 that Barbara have weekly appointments to work through issues related to domestic violence, Barbara attended three sessions, went thirteen weeks without a visit, attended one session in October and one in November, then went until late April 2009 before attending another session the day after she was questioned at trial about the frequency of her sessions.

The case plan also required that Barbara attend parenting and domestic violence classes. After missing a number of parenting classes, she eventually completed the required course in October 2007. She had begun attending domestic violence classes with AFS but believed she had to stop taking those classes after she was asked to leave the shelter in December 2006. By mid–2007 she had not resumed the classes. Around that time, she spoke to a social worker and described a recent violent encounter with Leo, where he came to her apartment and accused her of seeing another person. Barbara did not terminate her relationship with Leo; rather, in August 2007 Barbara decided she wanted to become pregnant again by Leo because she wanted both her children to have the same father. Dr. Long's report described "a well-established pattern for [Barbara] to enter into heterosexual relationships that are volatile, abusive, and drug-related."

By late 2007 Barbara had completed only her parenting class and the required evaluations.

---

**2.** Barbara also discussed her mental health in her second substance abuse evaluation in May 2007, in which she acknowledged having suicidal ideations.

### 6. Gary's removal immediately following his birth

On April 14, 2008, Barbara gave birth to Gary. Several days later, OCS assumed temporary custody of Gary after receiving a report that Barbara had tested positive for cocaine when she was admitted at the hospital. She denied using drugs when questioned by the investigating social worker at the hospital, and when her drug test was sent to the laboratory, it came back negative. The baby tested negative for cocaine at the hospital, but a meconium test performed several days later came back positive.[3] Leo was in the hospital when the social worker arrived, and Barbara admitted that he had been present during and since Gary's birth. Barbara was homeless at the time and staying on the couches of acquaintances. Based on concerns about substance abuse, domestic violence, and lack of appropriate housing, the social worker assumed custody of Gary and placed him in foster care with Michael.

### 7. Barbara's progress on her case plan since Gary's birth

In May 2008 Barbara began participating in the Women's Residential Reunification and Action Program (WRRAP), which offers domestic violence classes, life skills classes, and shelter. Her updated case plan required that she successfully complete this program. While in the program, Barbara continued to see Leo. Barbara requested that Leo be added to her weekly visitation with the children in July 2008, but she changed her mind after several weeks because Leo had gone "back to his old ways of being controlling." In August 2008 Barbara sought medical attention after her "ex-boyfriend" had "pull[ed] on a pierced nipple when [he] got angry." The superior court found that she was referring to Leo. In September 2008 Barbara was with Leo when he was arrested for a parole violation and was still using a picture of her and Leo as the profile picture on her MySpace page. Although Barbara finished the WRRAP program in November 2008, staff noted that her level of participation was minimal and had the sense that she was not fully committed to the program because she diminished the seriousness of her domestic violence issues and refused to terminate her relationship with Leo.

Barbara visited Leo several times while he was in prison and continued to have conversations with him to update him on their children until March 2009. At that time, Barbara sent a letter to Leo stating that their relationship was over; according to the superior court, this letter was sent at the advice of counsel.

Barbara completed her substance abuse treatment with Ascent in September 2008 and began to participate in after-care. Barbara went to AA meetings several times per month, and after the question whether she had a sobriety sponsor was discussed at trial, she obtained a sobriety sponsor. Despite Barbara missing drug tests in 2009, the superior court credited her testimony that she was sober and found that she had been sober since at least Gary's birth in April 2008.

Barbara's case plan also required that she "follow up with Megha Hammaker for all of her mental health needs and recommendations." As noted above, despite her testimony to the contrary, Barbara did not follow Hammaker's recommendation in early June 2008 that Barbara have weekly appointments to work through issues related to domestic violence, and Barbara went long periods without visits. At trial, Hammaker expressed her opinion that Barbara was "presently . . . not experiencing any major depressive symptoms or mood disorder symptoms," and that it was appropriate for her not to take any medication or see a professional for her mental health issues. Barbara was neither taking any medications nor regularly seeing Hammaker or any other mental health professional.

Barbara's case plan established regular supervised visits with her children through AFS. Barbara consistently attended her scheduled visits, and the social worker agreed that her interactions with her children were "loving" and "appropriate."

---

**3.** Meconium, the tarry stool material passed by a newborn child in the first days after birth, provides evidence of the mother's drug use over the last four to five months of pregnancy.

Barbara moved to Anchorage in January 2009 and rented her own apartment.

### 8. Leo's case plan

A social worker developed a case plan for Leo as well and mailed a copy to him on October 25, 2006. The plan required Leo to complete parenting and domestic violence classes, a substance abuse assessment, substance abuse treatment if recommended, and random weekly drug tests. Leo did not meet with a social worker to discuss his case plan requirements until May 2007, at which time he signed the plan and agreed to its terms. Around that time, Leo was arrested on a drug charge to which he pled guilty and went to jail for a month.

In September 2007 Leo tested positive for cocaine, leading to the revocation of his probation and a 60–day prison sentence. Leo was also charged with criminal trespass and received a suspended sentence. By the end of 2007, Leo had made almost no progress on his case plan, failing to complete a new substance abuse assessment or domestic violence classes, starting but not finishing a mental health evaluation, and only participating in a few drug tests. In March 2008 Leo completed a substance abuse assessment in which it was recommended that he participate in an intensive outpatient treatment program. Leo entered treatment that month.

Leo's case plan was updated in June 2008, although the issues to be addressed remained largely the same. Leo was required to participate in domestic violence and parenting classes and supervised visitation with his children. Leo completed an intake form for a domestic violence program that month in which he admitted to committing acts of domestic violence against Barbara, and then began but quickly abandoned the 36–week program.

In August 2008 Leo left the state and returned to Florida without notifying OCS. He stopped attending substance abuse treatment and was discharged for non-compliance as a result. By leaving the state, Leo also cut off visitation with his children. When he returned the following month, Leo was arrested on a probation violation and sentenced to 18 months in prison at the Palmer Correc-tional Center, a sentence he was serving during the termination trial.

By the end of 2008, Leo had completed parenting classes and started, but not completed, substance abuse treatment and domestic violence classes. He was incarcerated and acknowledged that it would be impossible for him to be reunified with his children at that time. As a social worker put it, he had not "mitigated the circumstances that brought the kids in[to] custody." By the conclusion of the termination trial in May 2009, Leo was still incarcerated and had made no further progress on completing the case plan.

### B. Proceedings

In April 2008 OCS filed a petition for adjudication of Gary as a child in need of aid. In May 2008 OCS filed a petition for termination of Barbara's and Leo's parental rights to Michael and Gary. The superior court consolidated Gary's adjudication hearing and the termination hearing and conducted a seven-day trial ending in May 2009. At the conclusion of trial, the superior court adjudicated Gary as a child in need of aid and terminated Barbara's and Leo's parental rights to both Michael and Gary. The court found by clear and convincing evidence that: (1) the children were in need of aid as a result of abandonment (by Leo), domestic violence (by both parents), substance abuse (by both parents), and Barbara's mental health issues; (2) the parents had failed, within a reasonable time, to remedy the conduct or conditions that placed the children at risk of harm; and (3) OCS had made reasonable efforts to provide family support services to reunify the family. It also found by a preponderance of the evidence that it was in the children's best interests that Barbara's and Leo's parental rights be terminated. We commend the superior court on its exemplary job of distilling the evidence presented at trial into thorough findings of fact and conclusions of law.

Barbara and Leo each appeal, challenging the superior court's admission of expert testimony, its finding that Michael and Gary were in need of aid, its finding that the parents

had not remedied their conduct, its finding that OCS made reasonable efforts, and its finding that termination was in the best interests of the children.

## III. STANDARD OF REVIEW

■ We review a decision to admit expert testimony for abuse of discretion.[4] In a child in need of aid (CINA) case, we review a superior court's findings of fact for clear error.[5] "Findings of fact are clearly erroneous if a review of the entire record in the light most favorable to the party prevailing below leaves us 'with a definite and firm conviction that a mistake has been made.'"[6] We review de novo whether a trial court's findings satisfy the requirements of the child in need of aid statute.[7]

■ We have not been entirely consistent in whether we treat a trial court's finding that a parent failed to remedy the conduct or conditions that placed his or her child at substantial risk as a question of fact or a mixed question of law and fact.[8] We take this opportunity to clarify that this determination is generally a finding of fact that will only be reviewed for clear error. Whether the parent has "remedied the conduct or conditions ... that place the child at substantial risk"[9] and whether "returning the child to the parent would place the child at substantial risk of physical or mental injury"[10] are factual determinations best made by a trial court after hearing witnesses and reviewing evidence, not legal determinations to which an appellate court should apply its independent judgment.

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Admitting The Testimony Of Dr. Long.

■ Both Barbara and Leo argue that the superior court erred in allowing the testimony of Dr. Grace Long because it was inadmissible expert testimony and because it was not relevant. Dr. Long performed a psychological evaluation of Barbara between March and May 2007 and produced a report discussing Barbara's history of substance abuse, domestic violence, and mental health issues and making diagnoses and recommendations. She had no further contact with Barbara. Dr. Long testified for the State during the termination trial on April 27, 2009. Barbara made a timely but unsuccessful objection to Dr. Long's testimony on the ground that the evaluation conducted more than two years prior was not a valid basis for an expert opinion.

Dr. Long proceeded to testify about her evaluation and conclusions and how Barbara's issues could affect her ability to parent. Dr. Long stated clearly that she was unable to offer a current diagnosis of Barbara because she had not seen her recently. Through their questioning, the parties provided Dr. Long with updated information concerning Barbara and asked Dr. Long to opine on the extent to which such circumstances might affect Barbara and change her original diagnosis.[11] In its decision, the su-

4. *Lynden Inc. v. Walker,* 30 P.3d 609, 612 (Alaska 2001).

5. *Brynna B. v. State, Dep't of Health & Soc. Servs.,* 88 P.3d 527, 529 (Alaska 2004) (citing *A.B. v. State, Dep't of Health & Soc. Servs.,* 7 P.3d 946, 950 (Alaska 2000)).

6. *Id.* (quoting *A.B.,* 7 P.3d at 950).

7. *Carl N. v. State, Dep't of Health & Soc. Servs.,* 102 P.3d 932, 935 (Alaska 2004) (citing *Sherry R. v. State, Dep't of Health & Soc. Servs.,* 74 P.3d 896, 901 (Alaska 2003)).

8. *Compare Wendell C. II v. State, OCS,* 118 P.3d 1, 4 (Alaska 2005) (referring to the parents' failure to remedy their conduct in a reasonable time as a "legal conclusion") *and Dennis B. v. State,*

*Dep't of Health and Soc. Servs., DFYS,* Mem. Op & J. No. 1202, 2005 WL 435173, at *7 (Alaska, Feb. 23, 2005) (stating that we review de novo "the legal conclusion that the parents failed to remedy their conduct") *with Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 212 P.3d 756, 763 (Alaska 2009) (holding that superior court did not "clearly err" in finding that the parent had not remedied the problematic conduct) *and Sherry R.,* 74 P.3d at 903 (same).

9. AS 47.10.088(a)(2)(A).

10. AS 47.10.088(a)(2)(B).

11. For example, the State asked Dr. Long whether it was enough to address Barbara's mental health issues that she "has somebody that she

perior court acknowledged that Dr. Long's report was dated,[12] but relied on her testimony because it found that the concerns expressed in Dr. Long's report were still applicable and that Dr. Long's recommendations had not been adequately followed. The court also noted that Dr. Long "strongly stood behind [her] analysis."

Dr. Long's testimony about the psychological evaluation and her conclusions at the time of the evaluation fall within the scope of permissible expert testimony, regardless of when the evaluation was performed.[13] She based her opinion on five days of clinical interviews and her review of numerous records—data "of a type reasonably relied upon by experts" in her field.[14] Even if Dr. Long's expert testimony about the evaluation was proper expert testimony, Barbara argues that it was not relevant and was therefore inadmissible because the evaluation took place two years earlier. To the contrary, the testimony was directly relevant to whether Michael was a child in need of aid. It was also relevant to whether Gary was a child in need of aid and whether Barbara had remedied the conduct or conditions that placed the children at substantial risk of harm. For example, Dr. Long's recommendation in 2007 that Barbara needed intensive substance abuse treatment followed by long-term counseling for depression could be considered along with evidence of whether she in fact received such treatment.

■ Dr. Long also expressed opinions on whether and how certain events that occurred subsequent to the evaluation, communicated through hypothetical questions that described facts elicited at trial, were likely to affect Barbara. Hypothetical questions that accurately describe the facts of the case are an acceptable basis for an expert opinion.[15] If Dr. Long had offered a current diagnosis of Barbara based solely on a psychological evaluation performed two years earlier, then arguably the expert opinion could have presented a problem. But Dr. Long explicitly declined to do so. The superior court did not abuse its discretion in allowing Dr. Long's testimony.

## B. The Superior Court Did Not Err In Finding That Michael And Gary Were Children In Need Of Aid.

In order to terminate a parent's rights and responsibilities, a superior court must find by clear and convincing evidence that the child has been subjected to conditions or conduct that would qualify the child as a child in need of aid pursuant to AS 47.10.011.[16] The superior court found that Michael and Gary were children in need of aid under AS 47.10.011(8) (domestic violence) and AS 47.10.011(10) (substance abuse) based on Barbara's and Leo's conduct, under AS 47.10.011(11) (mental health) based on Barbara's condition, and under AS 47.10.011(1) (abandonment) based on Leo's conduct. We affirm the court's finding that the children were in need of aid based on the first three grounds.[17]

talks to that she evidently trusts a lot ... but it's not an ongoing relationship." Barbara's counsel asked Dr. Long whether Barbara "entering and successfully completing and graduating from [a residential treatment program for substance abuse and domestic violence would] be an indication of how she's doing with her development."

12. The superior court mistakenly referred to Dr. Long's report as "a year old," but later identified the date of the report correctly.

13. Such testimony is regularly offered in CINA cases. *See, e.g., Sandy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 216 P.3d 1180, 1190–93 (Alaska 2009); *Neal M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 214 P.3d 284, 289 (Alaska 2009); *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* 204 P.3d 1013, 1019–21 (Alaska

2009). Indeed, expert testimony is required in termination proceedings under the Indian Child Welfare Act. *See* 25 U.S.C. § 1912(f) (2006).

14. *See* Alaska R. Evid. 703 (requiring that expert opinion be based on "[f]acts or data ... of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject").

15. *See J.A. v. State, DFYS,* 50 P.3d 395, 401 n. 18 (Alaska 2002) ("hypothetical questions ... sufficiently based on the facts of the case ... enable a qualified expert to give ... testimony" in a parental termination case).

16. AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

17. It is therefore unnecessary to reach the question of whether Michael and Gary were children

### 1. Alaska Statute 47.10.011(11)— mental health

■ The superior court found that OCS met its burden of proving by clear and convincing evidence that both children were in need of aid based on Barbara's mental health issues. It found that Barbara has a "long history of depression and suicide attempts," including attempting suicide prior to getting pregnant with Michael, when she was four months pregnant with Michael, and one year after his birth. The superior court observed that Barbara had not followed through on the strong recommendation of Dr. Long that she engage in extensive mental health therapy. Instead, Barbara maintained only a minimal relationship with a nurse practitioner and was not taking psychotropic medication as recommended. The superior court also found that Barbara's mental health issues had a "very clear ramification[ ]" for "her ability to parent her children," impacting her "day-to-day functioning and her judgment."

Barbara challenges the superior court's findings on the grounds that the court relied on Dr. Long's testimony, which was based on a two-year old psychological evaluation, and ignored the testimony of Hammaker that, at the time of trial, Barbara was not experiencing any "major depressive symptoms or mood disorder symptoms," she did not need to take medication, and her mental health did not impair her ability to parent. But it is the role of the trial court to make credibility determinations and weigh conflicting evidence as it did here.[18] It may have been

preferable for Dr. Long to update her evaluation with an in-person visit or to have another expert evaluate Barbara closer to trial, but it was not necessary.[19]

■ Barbara further argues, correctly, that a mental illness alone may not form the basis of a finding under this subsection[20] and contends that OCS failed to demonstrate the required nexus between her alleged mental illness and any risk of harm to her children.[21] She contends that OCS offered no "specific instances of how Barbara's mental health placed the children at substantial risk of harm."

In *Alyssa B. v. State, Department of Health & Social Services, Division of Family & Youth Services*, a mother made the same challenge to a superior court's finding that her daughter was in need of aid based on her mental illness.[22] Rejecting this challenge, we identified "specific conduct" found by the trial court that placed her daughter at risk: a refusal to work with the department leading to a failure to develop any bond with her daughter; and a refusal to cooperate with authority figures that may lead to an unwillingness to get help if her daughter needed it for medical or other problems.[23]

In this case, the superior court's finding that Barbara's mental health problems adversely affected her ability to parent is supported by the record. During trial, Barbara testified that she had attempted suicide when Michael was one year old. Dr. Long testified that if her depression remains untreated, it is

in need of aid based on Leo's abandonment. *See Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 54 n. 14 (Alaska 2003).

18. *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (citing *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

19. *See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009) (observing that an expert need not conduct an in-person interview before offering an expert opinion so long as the testimony is based on the facts of the case).

20. *See K.N. v. State*, 856 P.2d 468, 475 (Alaska 1993) (stating that mental illness alone may not support a CINA finding, but still finding the

CINA statute satisfied because the record linked the father's "continuing mental illness with his past instances of extreme neglect"); *see also V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1206 n. 22 (Alaska 2002) ("Mental illness, absent related conduct, cannot be a basis for termination of parental rights.").

21. A finding that a child is in need of aid under AS 47.10.011(11) requires a showing that "the parent, guardian, or custodian has a mental illness, serious emotional disturbance, or mental deficiency of a nature and duration that places the child at substantial risk of physical harm or mental injury."

22. 165 P.3d 605, 618–19 (Alaska 2007).

23. *Id.* at 619.

possible that she would attempt suicide again. Dr. Long also testified that Barbara exhibited a pattern of entering into relationships with abusive men with substance abuse problems. A social worker testified that the lack of treatment of her depression would continue to impact her ability to safely care for her children. The superior court's determination that Michael and Gary were children in need of aid based on Barbara's untreated mental health issues is supported by the record.

### 2. Alaska Statute 47.10.011(8)— domestic violence

 The superior court found that OCS met its burden of proving by clear and convincing evidence that both children were in need of aid based on domestic violence between Barbara and Leo. The court first noted that Barbara and Leo had stipulated that Michael was a child in need of aid under this provision, after which the court had adjudicated him as such. It then reviewed the evidence presented at trial demonstrating that there has been domestic violence throughout Barbara and Leo's relationship beginning in 2005 and continuing until just before trial: Barbara's request for a protective order; testimony by the parents at trial concerning violent incidents, at least one of which happened while Barbara was holding Michael; Barbara's cancellation of joint visits with Leo; and her visit to Mat–Su Regional Urgent Care in August 2008. The court did not find Barbara's denial that there was domestic violence in her relationship with Leo to be credible.

Because Gary was taken into custody by OCS at birth, the court recognized that he could not be adjudicated a child in need of

aid under a provision requiring direct exposure to domestic violence. But relying on AS 47.10.011(8)(B)(i), the court found that Gary was in need of aid because the parents placed him "at substantial risk of mental injury as a result of a pattern of ... terrorizing ... behavior that would, if continued, result in mental injury." The court based this finding on evidence of ongoing domestic violence between Barbara and Leo and expert testimony regarding domestic violence. The court did not credit Barbara's and Leo's testimony that they had ended their relationship, finding it "quite possible that [Barbara] and [Leo] will re-initiate their relationship."

Barbara first argues that the superior court improperly relied on the stipulation of the parties and precluded her from disputing their alleged domestic violence. But the superior court neither precluded Barbara from offering evidence on this issue nor relied solely on the stipulation in finding that OCS had satisfied its burden; it simply noted that it was difficult to understand how Barbara and Leo were contesting a fact they admitted at adjudication. Because the burden of proof is lower in an adjudication than at a termination proceeding,[24] a prior adjudication of a child as a child in need of aid is not conclusive in the termination proceeding.[25] Nonetheless, a court can consider a parent's stipulation and any other evidence offered at a prior adjudication hearing along with additional evidence presented at the trial in finding a child to be in need of aid for purposes of termination of parental rights.[26] Therefore, it was not improper for the court to consider the parties' stipulation among other evidence that Michael was a child in need of aid based on domestic violence.

**24.** *Compare* CINA Rule 15(c) (requiring proof by a preponderance of the evidence in an adjudication) *with* CINA Rule 18(c) (requiring proof by clear and convincing evidence in a termination proceeding).

**25.** *See Rick P. v. State, OCS*, 109 P.3d 950 (Alaska 2005) (holding that where parents have previously stipulated that the children should be adjudicated as being in need of aid, OCS still has the burden of proving in the subsequent termination of parental rights proceeding by clear and convincing evidence that the children were in need

of aid); *D.M. v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 209 (Alaska 2000) ("[N]othing resolved at the adjudication stage foreclosed a parent from fully litigating all relevant issues at the termination stage.").

**26.** *See D.M.*, 995 P.2d at 209 ("[A]t the termination proceeding, a court could review the evidence offered at the adjudication hearing, and, applying the stricter proof standard, make supplemental findings satisfying the requirements for termination.").

■ Barbara next argues that the superior court erred in finding Michael to be a child in need of aid under AS 47.10.011(8)(A), which requires OCS to prove that conduct by the parents resulted in actual "mental injury" to the child, defined as "serious injury ... as evidenced by an observable and substantial impairment in the child's ability to function in a developmentally appropriate manner" that is "supported by the opinion of a qualified expert witness."[27] OCS offered no expert witnesses at trial to testify that Michael had suffered mental injury as a result of Barbara's and Leo's conduct, and in fact no expert witness has evaluated the children. But there is no indication that the superior court made a CINA finding under AS 47.10.011(8)(A). The superior court did not specify the paragraph of subsection (8) under which it found that Michael was a child in need of aid as a result of domestic violence.[28] Given that the court made no reference to Michael suffering actual mental injury, it appears that the court made its CINA finding under paragraph (8)(B), which requires only a "substantial risk of mental injury."

■ Barbara argues that any CINA finding under paragraph (8)(B) would have been error because OCS's petition only requested a CINA finding under paragraph (8)(A). But Barbara was on notice that the State intended to present evidence regarding domestic violence during the termination trial and had an adequate opportunity to rebut this evidence and offer legal argument: the petition for termination references Michael's "exposure to domestic violence," Barbara's request for a protective order, her continued association with Leo, and the case plan requirement that she complete a "Family Violence Intervention class"; the petition for adjudication of Gary as a child in need of aid

filed several weeks before and consolidated with the termination hearing explicitly requested a finding under subsection (8) and described a "lengthy history of domestic violence between" Barbara and Leo; and Michael had already been adjudicated a child in need of aid under subsection (8). Even after trial began, Barbara had time to gather and present her own evidence regarding domestic violence. OCS elicited testimony from Barbara concerning domestic violence and its effect on the children early on the first day of trial (and over her counsel's objection). In scheduling the next day of trial more than 30 days later, the superior court gave counsel for the parents time "to work through all this discovery" and to "allow them to assess fully the ramifications of all this [domestic violence] evidence." Moreover, Barbara had the opportunity to present legal argument on why OCS had failed to prove that the children were in need of aid under subsection (8), and made arguments concerning both paragraphs (A) and (B) in her closing brief. Given the foregoing, Barbara suffered no prejudice from OCS's failure to explicitly reference paragraph (8)(B) in its termination petition. Therefore, the superior court could properly make a finding under any paragraph of subsection (8) supported by the evidence.[29]

Finally, Barbara argues that the superior court's finding under subsection (8) was not supported by the evidence at trial because the children had minimal exposure to domestic violence, and OCS failed to prove any "pattern of ... behavior" in the children's presence. But AS 47.10.011(8)(B)(i) does not require that the children be physically present when there is domestic violence (although Michael was in fact present in one instance).[30] Rather, it requires proof that con-

---

27. AS 47.17.290(9).

28. The failure of the superior court to specify what subsection of the CINA statute it is proceeding under, let alone what paragraph of the subsection, does not constitute error so long as the court's factual findings support a determination that the child is in need of aid. *See A.J. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 62 P.3d 609, 613–14 (Alaska 2003).

29. *Cf. McCormick v. City of Dillingham*, 16 P.3d 735, 743 (Alaska 2001) (holding that so long as a

complaint provides notice, plaintiff can recover under any theory supported by the evidence).

30. *See Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 54–55 (Alaska 2003) (rejecting argument that because terrorizing conduct was not directed at the child or took place before the child's birth, the CINA statute was not satisfied, and holding that father's "violent tendencies ... pose[d] a risk of future harm" to his child).

duct by the parent places the child at substantial risk of mental injury as a result of a "pattern of … terrorizing … behavior that would, if continued, result in mental injury." There was substantial evidence presented at trial of ongoing domestic violence between Barbara and Leo and testimony by an expert witness that exposure to domestic violence creates a substantial risk of mental harm to a child, even where the child is not physically present. This evidence supports a finding that Leo's acts toward Barbara created a significant risk of mental injury to the children if they had been placed with their parents. Therefore, the superior court did not err in finding that OCS proved by clear and convincing evidence that Michael and Gary were children in need of aid under AS 47.10.011(8) of the CINA statute.

### 3. Alaska Statute 47.10.011(10)— substance abuse

■ The superior court found that OCS met its burden of proving by clear and convincing evidence that both children were in need of aid based on substance abuse by Barbara and Leo. Under AS 47.10.011(10), a court may find a child in need of aid where the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." In finding Michael to be a child in need of aid, the superior court referenced the stipulation of the parties in Michael's adjudication and noted that Leo had conceded in his pleadings for the termination proceeding that Michael was a child in need of aid under this subsection. The court found Gary to be a child in need of aid based on Leo's continuing drug addiction, dismissing Leo's testimony that the only drug he currently uses is marijuana. Leo does not challenge this ruling on appeal.[31] Leo's concession with respect to Michael and his failure to challenge the superior court's holding with respect to Gary are, by themselves, sufficient for us to affirm the ruling that Michael and Gary are children in need of aid for purposes of the termination of both Leo's and Barbara's parental rights.[32]

The superior court also reviewed Barbara's substantial history of drug use, including marijuana, opiates, cocaine, and methamphetamine, through at least October 2007. Barbara used marijuana, methadone, and Percocet, either while pregnant with Michael or around the time he was born. She used cocaine during periods when she was caring for Michael. She repeatedly entered and failed to complete substance abuse treatment. These facts, together with the parties' stipulation, gave the superior court ample grounds to find that Michael was a child in need of aid based on Barbara's substance abuse.

With respect to Gary, the superior court credited Barbara's testimony that she had not used drugs since Gary's birth and commended her for completing her substance abuse treatment. But the court did not believe that Barbara had truly addressed her drug addiction because she had failed to undertake any follow-up activities after the completion of her program, she still regarded the harm to her children from drug use solely in terms of immediate danger that such usage might cause rather than its long-term effect on her parenting, and she continued to deny or minimize her past drug use. As a result, the court found that OCS had proven that Gary was a child in need of aid as a result of Barbara's "still untreated drug addiction."

Barbara does not deny that she used drugs up until the time Gary was born and while Michael was in her care, but she argues that drug use alone is not sufficient for a finding under this subsection of the CINA statute. She contends that OCS failed to satisfy the additional requirements of proving that her drug use impaired her ability to parent or that it posed a substantial risk of harm to her children. Barbara testified that she took

---

**31.** Instead, Leo joins Barbara's briefing related to this subsection of the CINA statute, which addresses only whether *Barbara's* substance abuse supports a finding that the children are in need of aid.

**32.** *See Jeff A.C., Jr. v. State,* 117 P.3d 697, 703 (Alaska 2005) (holding that a superior court can adjudicate a child as a child in need of aid "based on the acts of just one parent").

precautions to avoid exposing Michael to her drug use, such as leaving the home when she used drugs and not returning until she was sober, and avoiding skin-to-skin contact after drug use.

■ Although OCS did not present evidence that Barbara used drugs in Michael's presence, the statute does not require that a child be present when the drug use occurred.[33] The superior court heard evidence that Barbara used marijuana, methadone, and Percocet while pregnant with Michael or shortly after his birth and that she used cocaine during periods when she was caring for Michael. Evidence was presented that Michael was taken into OCS custody, and Barbara was required to leave a shelter after she tested positive for use of cocaine and a white powder was discovered in her room at the shelter. Evidence was presented that Barbara was in and out of substance abuse programs. Such conduct adequately demonstrates an impairment of parenting and a risk of harm to or neglect of Michael. Together with Barbara's stipulation that Michael was a child in need of aid under this subsection, the conduct supports the superior court's finding that Michael was in need of aid. OCS was not obligated to leave Michael with or return him to Barbara and wait to accumulate evidence of parenting problems based on her admitted drug use, thereby risking actual harm to the child, before requesting a finding that Michael is a child in need of aid.[34]

Barbara further argues that the superior court's finding regarding drug abuse was erroneous because she had been sober for over a year before the termination trial began. The CINA statute requires that a parent's ability to parent *"has been"* impaired

by drug use and drug use *"has resulted"* in risk to the child at some time prior to the adjudication.[35] Because Barbara used drugs while she was caring for Michael, her new sobriety is not determinative of whether he was a child in need of aid, but only relevant to whether she remedied her conduct, which we discuss below.

On the other hand, Barbara's sobriety since Gary's birth is relevant to whether the superior court properly found that Gary was a child in need of aid based on her drug use. The superior court found that Gary was a child in need of aid not because of Barbara's current drug use, but because Barbara failed to "fully understand[ ] the depth of her problems with drugs," leaving her addiction "still untreated." The CINA statute speaks only in terms of "use of an intoxicant," not potential for future use.[36] But Barbara's drug use during her pregnancy is sufficient to find Gary to be a child in need of aid—Barbara admitted to using drugs during her pregnancy with Gary, and Gary's meconium tested positive for cocaine. We have referenced neonatal drug use in affirming CINA findings in unreported cases, but always where it was accompanied by drug use following birth.[37] Exposing a child to cocaine in utero, even without drug use following birth, can also be sufficient to find the child to be in need of aid under AS 47.10.011(10). Therefore, the superior court did not err in finding that Gary was a child in need of aid based on Barbara's substance abuse.

### C. The Superior Court Did Not Err In Finding That Barbara Failed To Remedy The Conduct Or Conditions That Led To Removal Of Michael

33. AS 47.10.011(10).

34. *See Martin N.,* 79 P.3d at 54 (holding that OCS "is not required to wait to intervene until a child has suffered actual harm" before requesting a finding that a child is in need of aid).

35. AS 47.10.011(10) (emphasis added); *see also Danielle A. v. State, Dep't of Health & Soc. Servs.,* 215 P.3d 349, 354 (Alaska 2009) (CINA "statute permits courts to look at past conduct or conditions").

36. AS 47.10.011(10).

37. *See, e.g., Daphne W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* Mem. Op. & J. No. 1344, 2009 WL 1636261, at *3–*4 (Alaska, June 10, 2009) (affirming finding that children were in need of aid based on mother's drug use during pregnancy as well as ongoing substance abuse); *Sofia M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* Mem. Op. & J., No. 1220, 2005 WL 1540495, at *4 (Alaska, June 29, 2005) (same).

And Gary.[38]

 To terminate parental rights, the superior court must find by clear and convincing evidence that the parent has not within a reasonable time remedied the conduct or conditions that placed the child at substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury.[39] Acknowledging that it was a "close[ ] call," the superior court found that Barbara had not remedied her conduct. Although she had "formally complied with her case plan," completing substance abuse treatment, staying sober since Gary's birth, and completing domestic violence and parenting education, the court believed that she had not "internalized what she ha[d] learned and there [was] no real assurance that [she would] not fall back into her old dysfunctional ways." We agree that this is a close question and believe that the deference accorded to a superior court's factual findings is particularly appropriate in close cases. Our review of the record does not leave us with a firm conviction that the superior court made a mistake in finding that Barbara failed to remedy her conduct.

Initially, Barbara argues that because she complied with the recommendations of her OCS case plan, the superior court erred in finding that she had not adequately remedied her conduct. Even if Barbara had completed every element of her case plan, completion of a case plan does not guarantee a finding that she has remedied her conduct.[40] The question instead is whether she had remedied the problems that placed her children at risk and gained the necessary skills so that the children could be safely returned to her care. The superior court found that she had not.

First and most significant to the superior court was its finding that Barbara had not adequately addressed her mental health problems and had failed to engage in consistent treatment as recommended by Dr.

Long. The trial court found that Barbara's "sporadic" visits to Hammaker did not provide the kind of treatment recommended by Dr. Long. The trial court was further concerned about Barbara's false claim that she had seen Hammaker regularly since February 2006. The trial court concluded:

> Given [Barbara's] significant mental health and substance abuse history, the court found extremely troubling Ms. Hammaker's apparent position in testimony that there were no real concerns with respect to [Barbara's] mental health or that any treatment need only occur upon request by [Barbara]. The court also found troubling the fact that Ms. Hammaker would not communicate with the OCS workers in any meaningful manner, even though Ms. Hammaker's most recent evaluation of [Barbara] (May 12, 2009) indicated a continuing need for therapy, treatment, and support. The court accordingly concludes that Dr. Long's evaluation still is relevant and important and that [Barbara] has not received adequate services through Ms. Hammaker to address the concerns laid out in that evaluation. And until [Barbara] does so, she will not have remedied the substantial mental health issues that must be remedied before she can have full custody of her children.

Barbara argues that the court incorrectly favored Dr. Long's testimony over Hammaker's and suggests that she is willing to continue to work with Hammaker or another mental health professional. But the superior court made its finding after weighing the testimony of both Dr. Long and Hammaker, as well as listening to Barbara. We cannot say that its finding was clearly erroneous.

With respect to domestic violence, the superior court found that Barbara had "not fully integrated what she has learned with respect to domestic violence." The court

---

38. Leo admitted at the termination trial that he had not remedied his conduct, and does not challenge the court's failure to remedy finding on appeal. Leo failed to complete treatment for substance abuse, domestic violence, and anger management.

39. AS 47.10.088(a)(2).

40. *See V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) ("Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen.").

credited Dr. Long's conclusion that Barbara was predisposed to entering into volatile and abusive relationships, noting that notwithstanding her graduation from the WRRAP program, there had not been "a concomitant change in [Barbara's] overall thinking," and she "has yet fully to acknowledge the abuse she suffered." Indeed, the superior court questioned whether Barbara had permanently ended her relationship with Leo, finding it "quite possible that [they] will re-initiate their relationship." Again, reviewing the record, we cannot say that the superior court's finding that Barbara failed to remedy her condition related to domestic violence was clearly erroneous.[41]

With respect to substance abuse, the superior court found:

> [N]otwithstanding her graduation from substance abuse treatment, [Barbara] has not regularly attended 12–step meetings, maintained regular contact with a sponsor, or surrounded herself with individuals leading a lifestyle conducive to sobriety. And as noted above, she continued to minimize and even deny her drug use and abuse in her testimony. Under these circumstances, [Barbara] will require an extended period to prove her sobriety before it can reasonably be concluded that she really can and will live a clean and sober life.

The superior court's finding that Barbara had been sober at least since Gary's birth, slightly less than six months preceding her termination trial,[42] does not preclude a finding that she had failed to remedy her substance abuse problem. For example, in *Sherry R. v. State, Department of Health & Social Services, Division of Family & Youth Services*, we affirmed a trial court's finding that a mother did not remedy her conduct related to drug use despite the fact that she had been sober for approximately a year

before the termination trial, had been regularly attending AA meetings, and had maintained clean urinalysis results during that time period.[43] There, as here, the trial court properly relied on the mother's history of relapses and the questionable degree to which she accepted that she had a substance abuse problem.[44] The superior court's finding that Barbara had not remedied her conduct with respect to substance abuse was not clearly erroneous.

### D. The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts To Provide Family Support Services.

When terminating parental rights, OCS must prove by clear and convincing evidence that it made "reasonable efforts" to provide family support services designed to prevent out-of-home placement or enable the safe return of the child to the family home.[45] The superior court determined that OCS had made reasonable efforts, including: in-person reviews of the requirements of the case plan, referrals for substance abuse assessments and substance abuse treatment, drug testing, parenting classes, and domestic violence education, and consistent visitation, beginning immediately after Michael was taken into emergency custody. The superior court found that OCS's efforts fell short in two respects: it had at times been unable to provide Barbara with drug tests to prove her sobriety and it made "absolutely no effort to provide visitation to [Leo] while he was incarcerated," a failure the court described as "inexcusable." Despite these shortcomings, the court found that OCS had met its burden of reasonable efforts when looking at its reunification efforts in their entirety.

While Barbara challenged this finding as a point on appeal and complains generally about OCS's failure to increase her visitation,

**41.** *See Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003) (citing to mother's failure to end her romantic involvement with man who had been convicted of child sexual assault as evidence that she had not remedied the conduct or conditions that placed her children at substantial risk of harm).

**42.** Barbara admitted at trial that she last used cocaine in October 2007, approximately one year before the beginning of her termination trial.

**43.** 74 P.3d 896, 902–03 (Alaska 2003).

**44.** *Sherry R.*, 74 P.3d at 902–03.

**45.** *See* AS 47.10.086(a); AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

she does not pursue this challenge in her briefing. Leo argues that given the superior court's finding that OCS's failure to provide him with visitation while he was incarcerated was "inexcusable," it was error for the court to find that OCS had satisfied its burden of making reasonable efforts to reunify him and his children. He testified that he made numerous requests for visits while he was incarcerated, but OCS failed to provide these visits because of its lack of resources.

■■■ In reviewing whether OCS made reasonable efforts, a court considers the state's reunification efforts in their entirety.[46] The court must first identify the problem that caused the children to be in need of aid and then determine whether OCS's efforts were reasonable in light of the surrounding circumstances.[47] Michael was first taken into OCS custody and adjudicated a child in need of aid based on substance abuse and domestic violence between Barbara and Leo. After Michael was removed, OCS developed a case plan for Leo that identified these problems and steps Leo should take to remedy them and made referrals for a mental health evaluation, a substance abuse assessment, drug testing, domestic violence classes, and parenting classes. Leo did not take advantage of these efforts and made little progress in completing his case plan requirements. OCS regularly updated the case plan, discussed its requirements with Leo, and continued to make referrals as well as arranging for supervised visits. Leo completed the parenting classes and substance abuse assessment, but not the domestic violence classes or substance abuse treatment. After Leo was incarcerated in September 2008, parenting and possibly domestic violence classes were available to him through the prison system.[48]

Leo's only argument is that OCS failed to make reasonable efforts because, as the superior court found, OCS made no effort to provide Leo with visitation with his children when he was incarcerated between September 2008 and May 2009. While we agree with the superior court that OCS should make every reasonable effort to coordinate visitation where possible between incarcerated parents and their children, its failure to do so in this case does not preclude a finding that it made reasonable efforts for several reasons.

First, the scope of OCS's duty to make reasonable efforts is affected by a parent's incarceration. In the context of an ICWA case where OCS bears a higher burden of making "active" reunification efforts, we have held:

A parent's incarceration significantly affects the scope of the active efforts that the State must make to satisfy the statutory requirement. While neither incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts, the practical circumstances surrounding a parent's incarceration—the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration—may have a direct bearing on what active remedial efforts are possible. Thus, while the State cannot ignore its ICWA duties merely because of [the parent's] incarceration, his incarceration is a significant factor in our evaluation of the adequacy of the State's efforts in this case.[49]

Moreover, we have affirmed a finding that OCS made reasonable efforts overall even when its efforts were not reasonable during a particular period of time.[50] And OCS made

**46.** *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 77 P.3d 715, 720 (Alaska 2003); *see also Burke v. State., Dep't of Health & Social Servs., Office of Children's Servs.,* 162 P.3d 1239, 1245 (Alaska 2007) (stating that courts consider "the entire history of the services that OCS has provided a parent").

**47.** *Burke,* 162 P.3d at 1245.

**48.** Services offered by the Department of Corrections are considered efforts of OCS for purposes

of the reasonable efforts analysis. *See T.F. v. State, Dep't of Health & Soc. Servs.,* 26 P.3d 1089, 1096 (Alaska 2001).

**49.** *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 261 (Alaska 1999) (internal quotations and footnotes omitted).

**50.** *Audrey H. v. State, Office of Children's Servs.,* 188 P.3d 668, 679–81 (Alaska 2008) (holding that although OCS's efforts were limited during the

substantial efforts to help Leo address the specific problems that led to the removal of his children and now support the termination of his parental rights—domestic violence and substance abuse. Given Leo's current incarceration, OCS's efforts to provide Leo with family support services when he was not in prison, and Leo's failure to make any changes necessary to achieve reunification, the superior court did not clearly err in finding that OCS's reunification efforts in their entirety were reasonable despite its failure to provide visitation in prison.

### E. The Superior Court Did Not Err In Finding That Termination Of Barbara's And Leo's Parental Rights Was In Their Children's Best Interests.

■ When terminating parental rights, a court "shall consider the best interests of the child."[51] The court may order termination only if OCS proves "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[52] The superior court found that terminating the parental rights of Barbara and Leo would promote the best interests of the children. In making this finding, the court relied on the fact that the children have spent most of their lives in foster care and "[n]either of them have any real sense of their parents as parents," they are "well bonded with their foster parents" and think of "their current placement as their 'home,'" and "it would be traumatic to remove them from their present placement." The court found that neither parent was "ready and able safely to parent these children" at the conclusion of the termination trial, that they would not be ready within a reasonable time thereafter,

and that "returning either [child] to either parent would place them at risk of physical or mental injury." Given the children's need for permanency, the court concluded that it was in the children's best interests to terminate the parental rights of Barbara and Leo.

Barbara argues that the superior court erred by failing to consider the best interest factors enumerated in AS 47.10.088,[53] which she contends weigh against termination. She also points to testimony by social workers that a bond exists between Barbara and her children as a result of regular and positive visits and that the termination of that bond would be traumatic. She takes issue with OCS's reliance on the fact that the children have spent most of their lives in foster care, given her view that OCS has not truly attempted to reunify her and her children. Leo argues that OCS failed to present evidence of the children's mental or emotional status or needs and that there was evidence presented of both the children's bond with Leo and Barbara and the parents' determination to change.

■ The best interest factors listed in the statute are not exclusive and the superior court need not accord a particular weight to any given factor. Rather, the superior court is directed to "consider the best interests of the child" when deciding whether to terminate parental rights[54] and is permitted to "consider any fact relating to the best interest of the child, including" the statutory factors, when evaluating whether a parent has remedied his or her conduct.[55] The superior court properly considered the children's need for permanency, a crucial need for young

---

eight- to nine-month period preceding the termination proceedings, this did not render its efforts unreasonable "[w]hen considered in the context of the full history of its involvement with [the parent]").

51. AS 47.10.088(c).

52. CINA Rule 18(c)(3).

53. Factors include:
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.

54. AS 47.10.088(c).

55. AS 47.10.088(b).

children.[56] "[T]he fact that a child has bonded with [the] foster parent can [also] be a factor in considering whether it is in the child's best interests to terminate a parent's rights."[57] The superior court did not err in determining that the termination of Barbara's and Leo's parental rights was in the best interests of Michael and Gary based on their need for permanency, the stability they enjoy in their foster home, and the fact that it found neither Barbara nor Leo would be ready to care for the children on a full-time basis within a reasonable period of time.[58]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's termination of Barbara's and Leo's parental rights.

CARPENETI, Chief Justice, not participating.

---

**56.** See Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 222 P.3d 841, 850–51 (Alaska 2009) (approving of a superior court's consideration of "the children's need for stability and permanency" in evaluating the best interests of the children in a termination proceeding); Debbie G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs., 132 P.3d 1168, 1171 n. 5 (Alaska 2006) ("We have often noted that young children require 'permanency and stability' or risk long-term harm.").

**57.** Karrie B. ex rel. Reep v. Catherine J., 181 P.3d 177, 185 (Alaska 2008); see also AS 47.10.088(a) ("[T]he rights and responsibilities of the parent regarding the child may be terminated for purposes of freeing a child for adoption or other permanent placement . . . .").

**58.** See Dashiell R., 222 P.3d at 850 (reviewing best interest finding in termination of parental rights case under clearly erroneous standard).