NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SALLY C., | ) | |
| | ) | Supreme Court No. S-16426 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-15-00144 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, | ) | AND JUDGMENT* |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 1646 – August 2, 2017 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Gregory Heath, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Ruth Botstein, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Margaret McWilliams, Assistant Public Advocate, Juneau, and Richard Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

A mother appeals from the superior court's decision following a child in need of aid (CINA) adjudication hearing. The court found that her son Donald was a

---

\* Entered under Alaska Appellate Rule 214.

child in need of aid under AS 47.10.011(10) (substance abuse) because of her addictive or habitual use of an intoxicant resulting in substantial harm to Donald and that it was contrary to Donald's welfare to return home under CINA Rules 10(c)(3) and 15.[1] The mother argues that she was prescribed and using the opioid Subutex as part of her medically assisted treatment (MAT) program for her addiction and therefore her use of Subutex cannot be deemed addictive or habitual.[2] But the court found that she was not compliant with her treatment program because she failed to participate in required counseling and that she obtained other opioid drugs from other medical facilities contrary to the treatment program protocols. We affirm the superior court's CINA finding and its determination that it would be contrary to Donald's welfare to return him home to the mother's custody.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Donald was born to Sally and Marty in July 2015 at Providence Medical Center. Sally has a history of substance abuse and opioid addiction. In 2009 she began taking Subutex, a narcotic prescribed to treat opioid addiction, as part of a MAT program. Subutex is a brand name of buprenorphine, an opioid medication and a controlled substance under AS 11.71.180(d). While taking Subutex, Sally was required

---

[1]    We use pseudonyms to protect the privacy of the parties.

[2]    We use the term "opioid" as the superior court did, but we also use the word "narcotic" when necessary to accurately reflect testimony and case law. The American Heritage Dictionary entry for "opioid" refers readers to "opiate," which is defined as "[a]ny of various sedative narcotics containing opium or one or more of its natural or synthetic derivatives." *Opiate*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3rd ed. 1996) A "narcotic" is "[a]n addictive drug, such as opium, that reduces pain, alters mood and behavior, and usually induces sleep or stupor. Natural and synthetic narcotics are used in medicine to control pain." *Narcotic*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (3rd ed. 1996).

to participate in therapy and attend counseling, which can include Alcoholics Anonymous (AA), Narcotics Anonymous (NA), or Buprenorphine Anonymous (BA) meetings. Sally's treatments also required her to sign a contract agreeing that she would not obtain or consume any narcotic medication without advance notice to her Subutex provider. Nonetheless, Sally sought additional opioids from emergency rooms and urgent care centers in 2009 and 2010, later testifying that it was fair to say this happened a lot. Medications dispensed by these locations, unlike with outpatient facilities, go undetected by Alaska's prescription drug monitoring program, so doctors who prescribe Subutex through a MAT program and check the monitoring program are not aware of the dispensing or prescribing of other controlled substances. Sally's substance abuse was part of the basis for terminating her parental rights to her daughter Skye in 2010. Although Sally successfully detoxed off opioids for a period of time during that case, she did not remain drug-free.

Sally again became pregnant in early 2013 with her son Steven, Donald's older brother. Shortly after becoming pregnant she requested narcotics for kidney pain from Mat-Su Regional Hospital, but the doctor refused to prescribe them. The doctor expressed concern that in the prior six months Sally had been provided opioids by eight different doctors, from four different pharmacies, in 11 different prescriptions. Sally was put on Subutex during her pregnancy with Steven but still sought additional opioids and other drugs from emergency rooms for pain and injuries. Steven was born in October 2013, experienced withdrawal at birth, and was in foster care by the time he was six weeks old. Sally completed a nine-week relapse prevention course in April 2015 in accordance with a prior OCS case plan for Steven.

During her pregnancy with Donald and at the time of Donald's birth in July 2015, Sally was again engaged in a MAT program that required counseling and included a Subutex prescription. Dr. Liu, the doctor who prescribed Subutex as part of

Sally's MAT program around the time of Donald's birth, testified that Subutex is appropriate to use when a patient has both pain and opioid addiction like Sally because it works as a painkiller but does not "restart the addiction process." Dr. Liu also testified that his file did not contain documentation of Sally's counseling, though he had recommended it and his program requires it.

During her pregnancy with Donald, Sally twice sought additional opioids at urgent care centers or hospitals. In January 2015 Sally received hydrocodone from the emergency room at a hospital. She complained of shoulder pain and informed the staff that she was 15 weeks pregnant; there is no record of her having reported that she was using Subutex. In March 2015 Sally went to an urgent care center for a possible infection following a dental procedure. She reported having trouble tolerating the drug Percocet she was using and asked for oxycodone instead, which the urgent care center provided. Despite Sally's visits to medical care providers seeking additional opioids, a test of Donald's umbilical cord at birth in July 2015 showed that he "had not been exposed to methamphetamine, barbiturates, or opioids other than Subutex in the 20 weeks prior to [his] birth."

Donald experienced mild opioid withdrawal from the Subutex that Sally was taking; these symptoms intensified when he left the hospital and persisted for two to three weeks. They included body tremors and severe diarrhea. Donald has also experienced developmental delays for which he continues to receive therapy. Shortly after his birth, the Office of Children's Services (OCS) received a protective services report expressing concern about Donald's withdrawal and noting that both parents had other children in state custody. An OCS caseworker went to the hospital to investigate and determined that Donald would be at risk in Sally and Marty's care based on his withdrawal and Sally's erratic demeanor. OCS filed an emergency petition for custody that day, alleging Donald was a child in need of aid under AS 47.10.011(10)

(substance abuse) and (9) (neglect). After the court awarded OCS temporary custody, Donald was placed in the same foster home as Steven.

Sally underwent a psychological evaluation and parenting risk assessment with forensic and clinical psychologist Dr. Bruce Smith. His strongest recommendations to Sally were to maintain sobriety, to continue to follow her treatment providers' recommendations, and to participate in an aftercare program or a community support program like AA or NA. Dr. Smith also testified that he believed Sally was capable of caring for her children as long as she remained drug-free and sober and used the resources available to her through social services.

After taking custody of Donald, OCS began case planning with Sally. Sally disclosed she was taking Subutex, but maintained that it was medication only for her pain, rather than both pain and addiction. Based on the information Sally provided, OCS recommended that she taper off Subutex and see a medical specialist to address the root causes of her pain rather than continually taking narcotics. It was not until March 2016 that Sally disclosed she was taking Subutex for substance abuse treatment. At that point OCS recommended that Sally should have a treatment plan outlining how Subutex would be used as an opioid replacement drug and also recommended that she participate in therapy and counseling for her drug use. However, Sally failed to participate in counseling until only a few weeks before the adjudication trial. Despite testifying that she had been attending a weekly 12-step program since April 2015, she could not document these visits. And Sally could not offer much detail about the program's 12 steps at the trial.

An OCS caseworker testified at trial that Sally had demonstrated her sobriety through clean urinalysis results. The caseworker indicated that she was aware of cases where children were released to the custody of parents compliant with buprenorphine treatment. But she also testified that Sally had "never addressed the

underlying issues of her substance use," making any sobriety she had obtained fragile. The caseworker explained that Sally, as a parent with a history of opioid addiction who sought additional narcotics while on buprenorphine, posed a high risk to a young child like Donald.

## B. Findings

After an initial emergency probable cause hearing, months of continuances, negotiations, and a stipulation by Sally and Marty to temporary custody, the superior court conducted a nonconsecutive six-day contested adjudication trial in the spring of 2016. The court determined that Donald was a child in need of aid under AS 47.10.011(10). It made three findings relevant to this appeal.

First, the court found that "[Sally's] ability to parent has been substantially impaired by the addictive and habitual use of Subutex and other prescription opioids, and her failure to engage and progress in counseling supported by collaterals."[3] The court made clear that it was "not solely [Sally's] use of Subutex" that substantially hindered her ability to parent, but "also [her] underlying, untreated opioid dependence."

Second, the court found "by a preponderance of the evidence that [Sally's] addictive and habitual use of Subutex and other prescription opioids has resulted in both substantial harm and a substantial risk of harm to [Donald]." The court cited the painful withdrawal that Donald experienced "as a direct result of [Sally's] use of [Subutex] during gestation" and the "developmental delays, for which he continues to receive therapy." In addition, the court found that "[Donald] risks substantial harm due to his high needs . . . which [Sally] cannot meet because of her untreated, long-term opioid

---

[3] "Collaterals" refer to additional information, such as medical records, test results, and past assessments that give a provider a fuller picture of a patient's background.

addiction and failure to engage in and benefit from meaningful counseling . . . required by the MAT program."

As required by CINA Rules 10(c)(3) and 15(f)(1) when an out-of-home placement is made or continued following the adjudication of a child as a child in need of aid, the court found that it was "contrary to the welfare of [Donald] to return home" .[4] The court reasoned that "[Sally's] use of Subutex without meaningful participation in counseling continue[d] to significantly inhibit her ability to parent," and this "lack of meaningful counseling as required by the MAT program, coupled with [Donald's] high needs and young age, render[ed] it unsafe for [Donald] to return home." The court recognized that "evidence shows Subutex, as part of a MAT program, can be successful in treating a patient's opioid addiction" and that Sally did "not need to stop using Subutex" for Donald to return home; however, Sally "must participate in a state-approved counseling service that incorporates collaterals[] and demonstrate progress in understanding and controlling her underlying addiction issues, before her condition is truly being treated."[5]

---

[4] *See* CINA Rule 10(c)(3) ("The court may approve the removal of the child from the child's home only if the court finds that continued placement in the home is contrary to the welfare of the child . . . ."); CINA Rule 15(f)(1) ("The court may approve the removal of the child from the child's home only if the court makes the findings required by CINA Rule 10(c)(3)."); *see also Matter of J.A.*, 962 P.2d 173, 177 (Alaska 1998) (equating placing a child in state custody and allowing continued placement of a child in state custody and stating that each requires a finding that "placement in the home would be contrary to the child's welfare").

[5] The court also found that OCS made timely, reasonable efforts to reunite the family as required by CINA Rules 10.1(a) and 15(f)(2), a finding Sally does not challenge on appeal. The court did not find sufficient evidence of neglect to adjudicate Donald a child in need of aid under AS 47.10.011(9).

Sally argues that the court erred in several respects with regard to its finding that Donald was a child in need of aid under AS 47.10.011(10) (substance abuse) and in determining that it was contrary to Donald's welfare to return home under CINA Rules 10(c)(3) and 15(f).

## III.   STANDARD OF REVIEW

Whether a child is in need of aid is a factual finding reviewed for clear error.[6]  A factual finding is clearly erroneous if "a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[7] "Generally, conflicting evidence is insufficient to overturn the superior court's decision, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[8]

## IV.   DISCUSSION

A child is in need of aid under AS 47.10.011(10) when the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."  CINA Rule 15(f)(1) allows a child to be removed from his home following an adjudication trial "only if the court makes the findings required by

---

[6]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[7]     *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[8]     *Sherman B. v. State Dep't of Health & Soc. Servs, Office of Children's Servs.*, 310 P.3d 943, 949 (Alaska 2013) (quoting *Hannah B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 289 P.3d 924, 930 (Alaska 2012)).

CINA Rule 10(c)(3)." CINA Rule 10(c)(3) provides that "[t]he court may approve the removal of the child from the child's home only if the court finds that continued placement in the home is contrary to the welfare of the child." We note that the standard in Rule 10(c)(3) relates to "continued placement in the home," whereas the question here was whether to return Donald to his mother's home. Both parties and the court assumed that continuing to place Donald outside his mother's home pending disposition required a finding that it would be "contrary to the welfare of [Donald] to return home." We accept this assumption for two reasons. First continuing to place a child in a parent's home and returning a child to that home result in the exact same situation. And second the assumption is consistent with CINA Rule 10(e)(2), which provides that "[w]hen a party seeks the return of a child to the child's home pending adjudication or disposition, if the party makes a prima facie showing that removal is no longer necessary, . . . the court shall return the child to the home unless the Department proves by a preponderance of the evidence that return to the home is contrary to the welfare of the child."

Sally argues that the court erred by (1) relying on her Subutex use as a basis for its CINA finding because her Subutex use was not "addictive or habitual" as required under AS 47.10.011(10); (2) relying on the risk posed by her potential future use of drugs in light of her long-term opioid dependence as a basis for its CINA finding because AS 47.10.011(10) does not contemplate potential future use as a cause of substantial harm or risk of harm to a child;[9] (3) never finding how her use of prescription opioids other than Subutex during pregnancy resulted in substantial harm to Donald; and (4) determining that it was contrary to Donald's welfare to return home under CINA Rules 10(c)(3) and 15(f).

---

[9] *See Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1259 (Alaska 2010) ("The CINA statute speaks only in terms of 'use of an intoxicant,' not potential for future use." (quoting AS 47.10.011(10))).

**A.** **The Superior Court Did Not Clearly Err In Finding That Sally's Use Of Intoxicants Was Addictive And Habitual Under AS 47.10.011(10).**

Sally argues that her use of Subutex was not "addictive or habitual" because the drug was prescribed by a doctor and taken as part of a treatment plan to address a known medical condition and that the CINA statute protects parents in this position. She also asserts that "there was neither an allegation nor a finding that [she] was abusing her Subutex prescription." In support of her argument, Sally points out that Dr. Liu testified that Subutex is appropriate to use when a patient has both pain and an opioid addiction "because it works as a painkiller but does not restart the addiction process." She also notes that a substance abuse counselor that worked with Donald's father testified at trial that Subutex "stops the cravings for heroin, and with most people, it does a very good job, and they feel a normal life, and that's what it did with [Sally]."

We recognize that a parent's use of Subutex or other prescription drugs as part of a MAT program can be a valuable tool to assist a parent's recovery from addiction. OCS acknowledges this as well. An OCS caseworker testified that the OCS website indicates Subutex is an option for parents and testified that she does not believe OCS considers its use merely "addiction switching." And when Sally finally admitted to OCS that she was using Subutex to treat an opioid addiction, OCS appropriately recommended that Sally should have a treatment plan outlining how Subutex would be used as an opioid replacement drug and also recommended that she participate in therapy and counseling for her drug use. The superior court correctly noted that the use of prescription drugs in a MAT program is not in itself sufficient to make one that is a child in need of aid. A parent's proper use of a prescription drug pursuant to the therapeutic requirements of a treating medical provider to treat an addiction – without more – likely will not support a CINA finding under AS 47.10.011(10) because the use is not addictive or habitual.

However, the superior court found that this was not the case with Sally. She was not taking Subutex in accordance with the therapeutic requirements of her MAT program; instead Sally failed to participate in required counseling, and she sought and obtained other opioid drugs contrary to the MAT program's protocol. Therefore, the court characterized her use of Subutex as addictive and habitual. This finding is not clearly erroneous. While Sally took prescribed Subutex as part of her medically assisted treatment program to mitigate her craving for addictive drugs, especially when pregnant, she did not engage in adequate counseling as required by the MAT program and recommended by OCS. Sally did not start counseling until only a few weeks before trial; was unable to document that she attended AA, NA, or BA; and could not identify even the first step of these 12-step programs. The superior court did not clearly err in relying on Sally's substantial failure to comply with the therapeutic requirements of her MAT program and case plan, and in finding that Sally's use of Subutex was addictive rather than therapeutic.

The superior court also relied on Sally's addictive and habitual use of other prescription opioids as a basis for its CINA finding. The court's characterization of her use of other prescription opioids as addictive or habitual is well supported by the record. In January 2015 Sally visited the emergency room at a hospital and was prescribed hydrocodone for shoulder pain, and in March 2015 she visited an urgent care center and asked for and was provided oxycodone for a possible infection following a dental procedure. Both visits took place during her pregnancy with Donald. Given Sally's significant history of substance abuse and addiction, her admitted practice of visiting hospitals and emergency rooms seeking opioids during previous pregnancies, and the fact that opioid prescriptions from hospitals do not appear on Alaska's prescription drug monitoring program, meaning that her MAT program doctor would be unaware of this prohibited drug-seeking behavior, we conclude that the court did not clearly err in

finding that Sally's use of these other prescription opioids during pregnancy was addictive or habitual.

B.   **The Superior Court Did Not Clearly Err In Finding That Sally's Conduct Has Resulted In A Substantial Risk Of Harm To Donald Under AS 47.10.011(10).**

The superior court found "by a preponderance of the evidence that [Sally's] addictive and habitual use of Subutex and other prescription opioids has resulted in both substantial harm and a substantial risk of harm to [Donald]." Regarding substantial harm, the court found that "[Donald] was born with an addiction to Subutex, an opioid, as a direct result of [Sally's] use of the drug during gestation" and that he "experienced painful withdrawal symptoms for weeks following birth" and later was diagnosed with developmental delays. Regarding substantial risk of harm, the court found that "[Donald] risks substantial harm due to his high needs—for which he receives therapy—which [Sally] cannot meet because of her untreated, long-term opioid addiction and failure to engage in and benefit from meaningful counseling."

Sally argues that her Subutex use was not addictive or habitual and therefore no addictive or habitual use of an intoxicant resulted in substantial harm to Donald as required by AS 47.10.011(10). But because we uphold the court's finding that Sally's Subutex use was addictive and habitual, it was an appropriate basis for the court's CINA finding. And it is clear that Sally's Subutex use caused Donald substantial harm. We have previously concluded that "[e]xposing a child to cocaine in utero, even without drug use following birth, can . . . be sufficient to find the child to be in need of aid under AS 47.10.011(10)."[10] And we have recognized a child's after-birth "addiction itself and

---

[10]   *Id.*

-12-                                                    *1646*

the suffering involved in overcoming it" constitutes substantial physical harm.[11]  Here, *in utero* exposure to Subutex resulted in Donald's withdrawal symptoms at birth; these symptoms intensified when he left the hospital, and they persisted for two to three weeks while he overcame his addiction.  We conclude the superior court did not clearly err in finding that Sally's Subutex use caused Donald substantial harm.

Sally also argues that the court never attributed harm to Sally's use of other prescription opioids or indicated how their use harmed Donald or exposed him to a risk of harm.  But the court did explicitly link the use of non-Subutex prescription opioids to Donald's risk of substantial harm.  After discussing instances in which Sally consumed non-Subutex prescription opioids during pregnancy, the court found that "[Sally's] addictive and habitual use of . . . other prescription opioids has resulted in both substantial harm and a substantial risk of harm to [Donald]."  In *Barbara P.* we relied on the fact of *in utero* exposure to cocaine to uphold a superior court's CINA finding based on substance abuse.[12]  Here, the superior court explicitly linked the use of non-Subutex prescription opioids during pregnancy to Donald's risk of substantial harm, providing the same strong basis for affirming the superior court's CINA finding as in *Barbara P.*  And while Sally correctly argues that in *Barbara P.* we rejected the superior court's rationale that the mother's "still untreated" addiction was an appropriate basis for its CINA finding because it focused on future drug use,[13] Sally's addictive and habitual drug use during pregnancy and Donald's consequent exposure to prescription opioids *in utero* provide a sufficient basis for the superior court's CINA finding.

---

[11]     *Dennis B. v. State, DFYS*, No. S-11165, 2005 WL 435173, at *5 (Alaska Feb. 23, 2005).

[12]     *Barbara P.*, 234 P.3d at 1258-59.

[13]     *Id.* at 1259.

## C. The Superior Court Did Not Clearly Err In Finding That It Was Contrary To Donald's Welfare For Him To Return To His Mother's Home.

Sally argues that even if we affirm the superior court's CINA finding, we should nevertheless conclude that the court erred by finding that it was not safe for Donald to return home, because she is sober and engaged in counseling. In support of this position, she notes that Dr. Smith concluded that she was capable of parenting Donald as long as she maintained sobriety and took advantage of the appropriate social services, her OCS caseworker testified that she had demonstrated sobriety, and that the court concluded that stopping Subutex was not necessary for Donald to return home.

The court here found that Sally's "lack of . . . counseling . . . coupled with [Donald's] high needs and young age[] render[ed] it unsafe for [Donald] to return home."[14] We see no clear error in this finding. If the superior court intends to remove a child from a parent's home following an adjudication hearing, CINA Rule 15(f)(1) requires that the court make findings under CINA Rule 10(c)(3). Under CINA Rule 10(c)(3), the court must determine whether placement in the child's home "is contrary to the welfare of the child." And unlike AS 47.10.011(10), under which a mother's "still untreated" addiction cannot be relied on to support a CINA finding (because the "statute speaks only in terms of 'use of an intoxicant,' not potential for

---

[14] The superior court also explained that Sally did not need to stop taking Subutex in order for Donald to return home, but that she "must participate in a state-approved counseling service that incorporates collaterals, and demonstrate progress in understanding and controlling her underlying addiction issues."

future use,"[15]) no such requirement applies to a finding that a particular home placement "is contrary to the welfare of the child."[16]

It is undisputed that Sally has a long history of addiction with periods of sobriety followed by relapse, and the record supports the court's determination that this risk has not been addressed. Although an OCS caseworker testified at the adjudication trial that as of that time Sally was not using substances other than Subutex, she expressed concerns about Sally's ability to parent safely given her history of drug abuse, Donald's high needs, and Sally's failure to address the underlying issues of her addiction. The OCS caseworker also testified that Sally's lack of engagement in her 12-step program was worrisome; Sally was unable to name the program's 12 steps, unlike other clients the caseworker was familiar with, who could articulate each one clearly. In addition, Dr. Liu testified that his file did not contain documentation of Sally having attended counseling, even though he had recommended it and his program required it. Even after Donald was born, Sally did not engage in counseling until just a few weeks before trial. Sally also lied to medical providers attempting to help her address her addiction. She told Dr. Smith during an evaluation that she had been drug-free and sober for four and a half years in August 2016, despite her history of addictive drug use during this period. And a few months after Donald's birth, Sally told a medical care provider that she had never used illegal drugs, despite admissions at trial of cocaine and heroin use. This behavior reflects both a failure by Sally to address her long-term opioid addiction and the risk her addiction poses to Donald's welfare. We conclude that the court did not

---

[15] *Barbara P.*, 234 P.3d at 1259 (quoting AS 47.10.011(10)).

[16] CINA Rule 10(c)(3); *see Martha S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 268 P.3d 1066, 1083 (Alaska 2012) (upholding finding that returning children to their parents' custody would be contrary to their welfare based on children's high needs and parents' unwillingness to cooperate with OCS).

clearly err in determining that returning a high-needs toddler to a parent whose drug abuse history and belated treatment efforts demonstrate a significant risk of relapse would be contrary to his welfare.

## V.    CONCLUSION

We AFFIRM the superior court's finding that Donald was a child in need of aid under AS 47.10.011(10) and its decision to continue Donald's placement with his foster mother pending a final disposition.