NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ADRIENNE B., | ) |
| | ) Supreme Court No. S-19266 |
| Appellant, | ) |
| | ) Superior Court Nos. |
| v. | ) 3AN-20-00364/5CN, 3AN-23-00188CN |
| | ) (Consolidated) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF FAMILY & COMMUNITY | ) MEMORANDUM OPINION |
| SERVICES, OFFICE OF | ) AND JUDGMENT* |
| CHILDREN'S SERVICES, | ) |
| | ) No. 2141 – April 15, 2026 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Una S. Gandbhir, Judge.

Appearances: Megan M. Rowe, Anchorage, for Appellant. Elizabeth Leduc, Assistant Attorney General, Anchorage, and Stephen Cox, Attorney General, Juneau, for Appellee. Olena Kalytiak Davis, Anchorage, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Borghesan, Henderson, Pate, and Oravec, Justices. [Carney, Chief Justice, not participating.]

## I. INTRODUCTION

In 2020, the Office of Children's Services (OCS) took custody of two children after investigating reports of drug abuse and domestic violence in the home of

---

\*        Entered under Alaska Appellate Rule 214.

Adrienne B. and Gordon L.[1]  After two years of minimal engagement by Adrienne with OCS and her case plan, OCS petitioned to terminate her parental rights.[2]  The superior court held a trial and denied the petition, ruling that because of caseworker turnover and the failure to follow up on assisting Adrienne with obtaining a psychological evaluation, OCS had not made reasonable efforts to reunify the family.

OCS redoubled its efforts, assigning two caseworkers who both made efforts to connect Adrienne with mental health resources, drug treatment, and visitation with the children.  Five months later, Adrienne gave birth to a third child, who tested positive for amphetamines.  OCS took custody of this child and continued its reunification efforts.  But Adrienne continued to engage only sporadically with OCS.  After almost two years of improved efforts by OCS, the superior court granted its second petition to terminate Adrienne's parental rights.

Adrienne appeals all aspects of the court's termination decision.  Observing no error or clear error in the court's decision, we affirm in full.

## II.    FACTS AND PROCEEDINGS

Adrienne B. is the mother of three children at the center of this case:  Yael, born in July 2017; Nova, born in June 2018; and Noah, born in May 2023.  Gordon L. is the father of Yael and Nova.  Noah's father is unknown.

### A.    OCS's Involvement With The Family In 2018-2019

After Adrienne's second child Nova was born in June 2018, a test of the umbilical cord came back positive for cocaine.  Hair tests from Adrienne and her first

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    During subsequent proceedings, the father consented to adoption of the children.  This appeal concerns only the mother, Adrienne.

child, Yael, were also positive. In response, OCS took emergency custody of both Yael and Nova and placed the children with their paternal grandmother.[3]

Several months later, Adrienne entered inpatient substance abuse treatment. Her children were eventually placed with her while she was in treatment, but were removed due to violations of her parenting plan. Adrienne left that program early and engaged in outpatient treatment with a different provider.

Shortly thereafter, the children were once again placed with Adrienne under a trial home visit. Six months later, in October 2019, OCS released custody of the children to Adrienne.

**B.    In 2020 OCS Took Custody Of The Children, And In 2022 The Superior Court Denied Its Petition To Terminate Adrienne's Parental Rights.**

In the summer of 2020, OCS received a report that Adrienne and Gordon were engaging in frequent drug use in the home and committing domestic violence against each other. In July 2020 OCS filed an emergency petition to adjudicate Yael and Nova as children in need of aid due to risk of physical injury, neglect, risk of mental injury, and substance abuse.[4]

On the day before the petition was filed, multiple caseworkers made contact with Adrienne and the children outside their home. The caseworkers explained the concerns that were raised in a protective services report and requested that Adrienne bring the children to a local clinic for assessment. Adrienne was upset, but said she would meet them there. She did not. Caseworkers located the family the following day and had police escort them to the clinic for interviews and drug testing. Adrienne refused to provide a hair or urine sample. And OCS noted that unlike the previous day, the children's heads were shaved, so OCS was unable to obtain a hair sample. OCS

---

[3]    The children's paternal aunt, Shantall, was a secondary placement and frequently cared for the children while their grandmother was at work.

[4]    *See* AS 47.10.011(6), (8), (9), (10).

obtained urine samples from the children, which tested positive for cocaine and methamphetamine.

The court approved OCS's emergency petition and granted temporary custody to OCS. OCS then placed the children in the care of their paternal aunt, Shantall. Subsequently, in February 2021 the superior court adjudicated Yael and Nova as children in need of aid due to risk of physical injury, risk of mental injury, neglect, and parental substance abuse.[5]

OCS met with Adrienne and her attorney and discussed a plan to remedy these conditions in March 2021. The plan included a "[d]ual [m]ental health and substance use assessment," with referrals to Alaska Behavioral Health, Aleutian Pribilof Islands Association, and Cook Inlet Tribal Council (CITC). And it involved a referral for random urine analyses (UAs) so that Adrienne could "demonstrate sobriety through consistent substance screenings." The case plan also included a referral for a course on domestic violence. Finally, it instructed Adrienne to stay in touch with Shantall to arrange visitation with the children, and to utilize a parent navigator from Alaska Youth and Family Network to support visitation. Adrienne received a copy of her case plan with contact information for the involved providers. But over the months that followed, engagement between Adrienne and OCS was sporadic. OCS cited difficulties on its end due to a cyber-attack on the Department of Health and Social Services. Adrienne told the court that she was frustrated with "the switching of case managers," which OCS described as an agency-wide staff-retention issue.

After a lengthy period during which OCS reported little engagement by Adrienne, including minimal visitation with the children, OCS filed a termination petition in June 2022. The superior court held a two-day trial in October 2022. And in December 2022 the court announced a decision on record denying the termination

---

[5]     *See id.*

petition due to OCS's failure to make reasonable efforts toward reunification. It found that the children were in need of aid due to abandonment, risk of mental injury due to domestic violence, and substance abuse.[6] Although it found that Adrienne failed to remedy these circumstances, it identified two related failures in the efforts made by OCS.

First, it found that OCS never followed through on the recommendation for a psychological assessment made by the family's caseworker shortly after adjudication. The court noted that "[h]ad this been done at any point in the case, the Department might have been able to formulate a better plan for [Adrienne] or address any mental health needs."

Second, it found that OCS had assigned seven different caseworkers to Adrienne's case between July 2020 and December 2022, and that this turnover was likely linked to Adrienne's failure to remedy her conduct: "There's no question that [Adrienne] needs to do better here. But given the turnover and the resulting inability to establish even a basic relationship between caseworker and the parent, the Department has not given [Adrienne] a roadmap for her to do any better." Given that it found OCS had not made reasonable efforts toward reunification, the court denied the termination petition.

## C. In 2023 Adrienne Had A Third Child, Noah, And In 2024 The Superior Court Granted OCS's Petition To Terminate Adrienne's Parental Rights To All Three Children.

In January 2023 OCS assigned Adrienne a new primary caseworker. An OCS employee who had previously worked with Adrienne was assigned to supervise her ongoing case. The caseworker and supervisor re-established contact with Adrienne and referred her to family visitation services, but they were unable to schedule a case planning meeting. At the end of the month, Adrienne showed up at OCS to discuss her

---

[6] *See* AS 47.10.011(1), (8), (10).

case plan. During this unscheduled meeting, the supervisor provided Adrienne with a road map to follow for her case. He made referrals to specific providers for a mental health assessment and a substance abuse assessment. He also referred Adrienne to UA testing so she could demonstrate her sobriety, and he made sure she understood how the testing system worked.

The supervisor asked Adrienne to return in a few days to go over her plan with the primary caseworker, but Adrienne did not return. The caseworker made numerous attempts to establish communication with Adrienne. But OCS was unable to make contact until a meeting in March. At that time, they went over the services that Adrienne had been referred to. Although Adrienne had not shown up for any UAs, the caseworker referred her for additional UAs so that she could demonstrate her claimed sobriety. Adrienne had a visit with the children in March at OCS, but then was removed from the schedule for the month after missing two visits in a row.

At this point, the children had been in Shantall's care for about two and a half years, and she had recently informed OCS that she planned on relocating to Texas and hoped to continue to care for the children there. OCS indicated that it would continue to work toward the children's reunification with Adrienne, while supporting the children's continued placement with Shantall in Texas.

Through the rest of March and April, the caseworker had difficulty reaching Adrienne. He continued to make efforts to refer her to services, including a referral for a psychological evaluation. Adrienne did complete a substance abuse assessment with CITC at one point, but the caseworker was unable to integrate the results of that assessment into Adrienne's case plan because, contrary to clear requests by the caseworker, she would not sign releases of information.

In May 2023 the caseworker met with Adrienne and urged her to commit to a family visitation plan, providing options for the following week, but she declined to commit. The caseworker reminded Adrienne of Shantall's plans to relocate to Texas with the children. He emphasized the need to figure out a schedule for phone calls with

the children in light of this relocation, as well as the need to communicate with OCS more frequently and engage with the referred services. He had recently learned that Adrienne was discharged from CITC due to lack of participation, so he urged her to follow up with them. And he highlighted the need for her to sign a release of information with CITC and other service providers so that OCS could exchange the sensitive information that was necessary for tailoring services to Adrienne's needs.

At the end of May, Adrienne gave birth to Noah. Noah was taken into OCS custody after he tested positive for methamphetamine at birth. When Adrienne refused to take a drug test before discharge, an on-call caseworker asked her what the results of a drug test would show, and she said "probably meth." Her discharge records indicated that although she denied cocaine and amphetamine use, prenatal tests were positive for both.

Adrienne's caseworker was unable to meet with her in the hospital. He scheduled a meeting for them in June, which she failed to attend. Later in July, however, Adrienne met with both the caseworker and supervisor. Although she left this meeting abruptly, the caseworker was able to provide her with a family contact plan for all three children. The supervisor attempted to follow up with Adrienne about family contact in the following months but was unsuccessful. In August 2023 the caseworker spoke with Adrienne and discussed her referral for a psychological evaluation, but when he brought up releases of information she cursed at him and hung up. In December OCS filed a second petition to terminate Adrienne's parental rights, this time for all three children.

Over the following months, both the caseworker and the supervisor continued to try to engage with and support Adrienne. The supervisor offered support to Adrienne through email and phone, providing referrals for services and family visitation plans. The caseworker made similar efforts, including continued attempts to case plan with Adrienne. But Adrienne's participation did not improve, and although she sought out a psychological assessment in February 2024, she did so without signing

a release of information or allowing OCS to exchange collateral information. She also participated minimally in visitation. During the year preceding trial, she attended visitation with her youngest child six times and with her older children just once. She also failed to show up for almost all of her UAs. In July 2024 Adrienne emailed the case supervisor, apologizing for her lack of engagement with services and expressing a commitment to work her case plan, and the supervisor responded with encouragement. But three weeks passed and Adrienne failed to follow through, missing case planning meetings and UAs.

The superior court held a termination trial over three days in August and September 2024. At the conclusion of trial, the court recorded a decision on record granting the State's petition. It started by noting its CINA findings from the first trial — that the children were in need of aid due to abandonment, risk of mental injury due to domestic violence, and parental substance abuse — and it determined that those findings continued to apply at the time of this second trial.

The court found the testimony of the OCS caseworker and supervisor to be credible and reliable evidence that Adrienne had "largely failed to take any of the steps in her case plan." It noted her sporadic engagement with services and failure to participate in random UAs and hair follicle tests. It also found that she failed to maintain contact with OCS, noting her unwillingness to follow a schedule for child visitation or case planning. It categorized this under Adrienne's insistence that engagement with OCS be on her terms, observing that "there [was] really very little indication that anything the Department might do would result in any rapport or trust with [Adrienne]."

The court specifically addressed reasonable efforts. It noted that OCS's efforts could be "calibrated to the level of interest in parenting demonstrated by the parent," citing *Amy M. v. State, Department of Health & Social Services, Office of*

*Children's Services*.[7]  It found that Adrienne had maintained "very little parent-child relationship" with the children for the past six years.  The court expressed that while OCS had taken the ruling after the first termination trial to heart when it came to reasonable efforts, Adrienne had not, and had "done little to re-engage as the court also found she would need to do to avoid another termination trial."  It found that OCS had since provided "[Adrienne] a roadmap for her to do better," but she "[had] not followed it."  The court concluded by finding that because the children needed permanency in their lives, termination of Adrienne's parental rights was in their best interests.

Adrienne appeals all of the findings underlying the superior court's termination order.

## III.  STANDARD OF REVIEW

When considering "a child in need of aid (CINA) termination proceeding we review a superior court's factual findings for clear error."[8]  Factual findings "are clearly erroneous if review of the entire record leaves us with a definite and firm conviction that a mistake has been made."[9]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[10]

"Whether a child is in need of aid and whether the parent failed to remedy the conduct or the conditions that placed the child at substantial risk of harm are factual

---

[7]    320 P.3d 253 (Alaska 2013).

[8]    *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 642 (Alaska 2013) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1103 (Alaska 2011)).

[9]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012) (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)) (internal quotation marks omitted).

[10]   *Id.* at 428 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 175 P.3d 1263,1267 (Alaska 2008)).

findings reviewed for clear error."[11] "Whether OCS has made reasonable reunification efforts is a mixed question of law and fact," and "[w]hether the superior court's factual findings satisfy [reasonable efforts]" is reviewed de novo.[12] Best interests findings are factual findings and thus reviewed for clear error.[13]

## IV. DISCUSSION

Adrienne argues that the superior court erred or clearly erred in making required findings underlying its termination order and that we should therefore reverse the court's termination of her parental rights. Before a court may order the termination of a parent's rights, it must find by clear and convincing evidence that

(1) a child is in need of aid under at least one condition listed in AS 47.10.011;

(2) the parent has failed, or failed within a reasonable time, to remedy the conduct that caused such harmful conditions; and

(3) OCS has made reasonable efforts to provide services in support of reunifying the parent and child.[14]

The court must also find by a preponderance of the evidence that (4) termination is in the best interests of the child.[15]

Adrienne appeals each of the superior court's required findings. After examining each step, we conclude that the superior court did not err or clearly err.

---

[11] *Id.* (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011)) (internal quotation marks omitted).

[12] *See Casey K.*, 311 P.3d at 643 (Alaska 2013) (citing *Sherman B.*, 290 P.3d at 428); *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[13] *Sherman B.*, 290 P.3d at 428.

[14] AS 47.10.088(a).

[15] AS 47.10.088(c); CINA Rule 18(c)(3).

**A.  The Superior Court Did Not Clearly Err In Finding The Children In Need Of Aid Due To Parental Substance Abuse.**

Adrienne argues that the superior court clearly erred in finding that the children were in need of aid due to abandonment, risk of mental injury, and parental substance abuse.[16]  If the superior court correctly finds a child in need of aid under at least one of these statutory subsections, we will affirm the overall CINA finding.[17]  Because we hold that the court did not clearly err in finding that the children were in need of aid due to Adrienne's substance abuse, we affirm on that basis.

Adrienne argues that the superior court clearly erred in finding the children in need of aid due to substance abuse because she claims that there was no evidence at trial of current substance use that posed a risk of harm to the children.  She observes that while a test from the children came back positive for cocaine in July 2020, that was "over four years before trial and lacked a clear nexus to any present risk."  And she contends that OCS presented no evidence that the children were present for any drug use, suggesting that this means they were not at risk of harm.

Adrienne's arguments misunderstand the question at issue.  Before terminating parental rights, the superior court must find that the child "*has been* subjected to conduct" under AS 47.10.011.[18]  Alaska Statute 47.10.011 defines a "child in need of aid" as a child that "*has been* subjected to" at least one of several categories of conduct, including parental substance use that causes a substantial risk of harm to the child.[19]  Thus, risk of harm at the time of the termination proceedings is not the operative question underlying the CINA finding.  Nor is the question whether the

---

[16]  *See* AS 47.10.011(1) (abandonment), (8) (mental injury), (10) (substance abuse).

[17]  *See Dale H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 235 P.3d 203, 211 (Alaska 2010).

[18]  AS 47.10.088(a)(1) (emphasis added).

[19]  AS 47.10.011 (emphasis added).

children were actually present during the substance use.[20] A parent's substance use renders a child in need of aid when the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child."[21] The question, then, is whether — after considering "all evidence of the parent's pre-termination hearing conduct, including evidence of parental conduct predating the CINA adjudication" — the children have been subject to a substantial risk of harm due to Adrienne's substance use, whether or not they were in the room when such use occurred.[22] In addressing Adrienne's argument, OCS correctly points to our decision in *Barbara P. v. State, Department of Health & Social Services, Office of Children's Services* as instructive.[23] As we said there, "[e]xposing a child to cocaine in utero, even without drug use following birth, can also be sufficient to find the child to be in need of aid under AS 47.10.011(10)."[24]

Here, there is ample evidence that the children were at substantial risk of harm due to Adrienne's substance abuse. OCS initially took custody of Adrienne's older children in 2018 when, after Nova's birth, the umbilical cord came back positive for cocaine, indicating that Nova was exposed to cocaine in utero. Adrienne's hair follicle test confirmed this as well. After OCS took custody of the older children,

---

**20** *See Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, (Alaska 2011) ("[W]e have held that a child need not be present when substance abuse is occurring in order to suffer its negative impacts." (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1258-59 (Alaska 2010))).

**21** AS 47.10.011(10).

**22** *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1161 (Alaska 2000) (quoting *D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 209 (Alaska 2000)).

**23** 234 P.3d at 1259.

**24** *Id.*

Adrienne attempted to remain sober, and she provided negative tests in April 2019. But she had relapsed by the end of the month. Although she demonstrated enough progress to regain custody in October 2019, OCS took custody of the older children again in July 2020 because they tested positive for amphetamine exposure. And after years of incomplete engagement with substance abuse assessments and treatment, Adrienne's third child, Noah, tested positive for in utero exposure to methamphetamine in 2023. Additionally, throughout the six years of OCS involvement, Adrienne missed the large majority of the UAs scheduled by OCS — about 150 in total. In light of all of this, the court did not clearly err in finding that the children were at substantial risk of harm due to Adrienne's substance abuse.[25]

## B. The Superior Court Did Not Clearly Err In Finding That Adrienne Failed To Remedy Her Conduct.

When terminating parental rights, the court must find that the parent has not remedied, or has failed to remedy within a reasonable time, "conditions in the home that place the child at substantial risk of harm."[26] In making findings about whether a parent has remedied such conduct or conditions, the court "may consider any fact relating to the best interests of the child."[27] This includes the likelihood of returning the child to the parent within a reasonable time, the amount of effort put in by the parent, the harm to the child, the likelihood that harm will continue, and the history of the parent's conduct.[28]

---

[25] *See Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 520-21 (Alaska 2023) (holding there was "unequivocal support" for finding of substantial risk of harm from substance abuse where child tested positive for drugs at same time as parent, parent was found by law enforcement with drugs and child in custody at same time, and parent had later positive tests along with numerous missed tests).

[26] AS 47.10.088(a)(2).

[27] AS 47.10.088(b).

[28] *Id.*

Adrienne contends that her communications with OCS show that she wanted her children back and that she worked on the case plan to regain custody. She cites our decision in *Charles S. v. State, Department of Health & Social Services, Office of Children's Services* for the idea that completion of a case plan does not on its own warrant a finding that conduct has been remedied.[29] Instead, courts look to whether parents have "gained the necessary skills so that the children [can] be safely returned to [their] care."[30] This is true. But here, that analysis weighs against Adrienne. Even if we were to disregard Adrienne's lack of engagement with OCS and with her case plan, the record does not support an assertion that she has gained necessary skills such that the children could safely return to her home.

Indeed, Adrienne cites little in the record that could advance her position. She points to some limited engagement with classes in 2023 and 2024 (including classes that OCS told her did not meet the State's standards), some substance abuse treatment at CITC in 2023 (from which she was discharged for non-participation three months before a confirmed relapse), and a statement at trial that there had been no police reports involving her since 2022 (although she was incarcerated as recently as February 2024 for felony charges). Apart from these points, her position seems to be that because recovery is non-linear, so too is the standard for remediation. She says that while she "experienced relapses and intermittent periods of non-compliance, these setbacks are not uncommon in recovery and must be viewed in the broader context of addiction as a treatable condition." She closes her argument by asserting that "[t]he law does not require immediate, perfect remediation; it requires sustained, good-faith effort," which she contends that she exhibited.

---

[29] 442 P.3d 780, 789 (Alaska 2019).

[30] *Id.* (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1260 (Alaska 2010)).

While we appreciate her efforts towards recovery, our focus must be not only on the efforts themselves, but on the results of such efforts, a sentiment that Adrienne acknowledges. We have held that even good-faith efforts to remedy substance abuse may be insufficient where parents have not gained the necessary skills to safely care for their children.[31]

As OCS points out, there was a multitude of evidence supporting the superior court's finding that Adrienne did not remedy the pattern of substance abuse that placed her children at risk. This includes the evidence of Adrienne's relapses and the children's drug exposures, described above. Additionally, OCS presented evidence that at the time of the termination trial, after six years of OCS involvement, Adrienne was still not engaged in any substance abuse related services. Indeed, the record indicates that in spite of her relapses, Adrienne had not meaningfully engaged in treatment in recent years, and she had continually missed the UAs scheduled for her.

In light of this, we are not left with a firm conviction that a mistake has been made regarding Adrienne's failure to address her substance abuse. We appreciate Adrienne's observation that setbacks are common in recovery and that addiction is a treatable condition. But her continued struggles and failure to engage with OCS, in light of her history of addiction and relapse, support the superior court's finding that she failed to remedy the conduct that placed her children in need of aid.

---

[31] *See Barbara P.*, 234 P.3d at 1260-61 ("Although [the parent here] had 'formally complied with her case plan,' completing substance abuse treatment, staying sober since [the child's] birth, and completing domestic violence and parenting education, the court believed that she had not 'internalized what she ha[d] learned and there [was] no real assurance that [she would] not fall back into her old dysfunctional ways.' " (last three alterations in original)).

## C. The Superior Court Did Not Err In Determining That OCS Made Reasonable Efforts To Reunify The Family.

Adrienne frames her argument regarding OCS's efforts around the superior court's 2022 denial of OCS's termination petition. She observes that in December 2022, the court denied OCS's petition to terminate her parental rights as to her older children, concluding that OCS had failed to make reasonable efforts to reunify her with her children. She argues that OCS did not improve its efforts after the 2022 trial and that the court therefore erred in concluding that OCS's overall efforts were reasonable.

Reasonable efforts are defined in AS 47.10.086: "[OCS] shall make timely, reasonable efforts to provide family support services to the child and the parents . . . to enable the safe return of the child to the family home . . . ."[32] This includes OCS's duty to (1) identify services necessary to remedy the conduct or conditions placing the children at risk, (2) actively offer these services, and (3) document its efforts.[33] When reviewing reasonable efforts we consider "the entire history of services that OCS has provided a parent."[34] And we consider the history of services provided to the family overall in support of reunification, such as services or efforts related to the children and placement-related efforts.[35] Reasonable efforts need

---

[32]    AS 47.10.086(a).

[33]    AS 47.10.086(a)(1)-(3).

[34]    *Burke P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1245 (Alaska 2007).

[35]    *See* AS 47.10.086(a) ("[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to . . . enable the safe return of the child to the family home . . . ."); *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 267 (Alaska 2019).

not be perfect, only reasonable under the circumstances.[36] These circumstances include the "parent's unwillingness to participate in treatment" and their "expressed interest in parenting."[37] In determining whether OCS's efforts were reasonable, the primary consideration is the best interests of the children.[38]

We note that while the superior court was concerned about OCS's efforts prior to the first termination trial, its concern was not due to a total lack of efforts.[39] Rather, its concern was about the lack of follow-through in OCS's efforts, particularly as related to a recommended psychological evaluation, and it identified caseworker turnover as a likely cause of that failure.

Adrienne argues that the issues of caseworker turnover and associated lack of follow-through by OCS continued after the first termination trial. But the record does not support that assertion. First, to the extent that Adrienne's argument focuses upon caseworker turnover in itself, the record demonstrates that she went from having eight caseworkers at different times leading up to the first termination proceeding, to

---

[36] *Amy M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 320 P.3d 253, 259 (Alaska 2013).

[37] *Id.* (citing *Audrey H. v. State, Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008)); *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015)).

[38] AS 47.10.086(f); *see also Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1165 (Alaska 2016).

[39] When the older children were formally adjudicated as children in need of aid in March 2021, the superior court made findings that OCS was providing reasonable efforts. And in its order denying termination in 2022, the court noted that the efforts that were made by each individual caseworker were "undercut and confounded" by the caseworker turnover.

having two concurrent, continuous caseworkers over the eighteen months preceding the second termination trial.[40]

Adrienne's argument further fails to address the evidence that OCS made extensive and consistent efforts, following the first termination proceeding and through the second, to assist her with the concerns that caused the children to be in need of aid, and that she often resisted or failed to engage with those efforts. Such evidence supports the superior court's assessment that OCS took its ruling in the first termination trial to heart and proceeded to provide Adrienne with a true roadmap to reunification, and that Adrienne failed to utilize that roadmap. One example of this lies in Adrienne's failure to meaningfully engage with OCS's referral for psychological and substance abuse assessments, as shown by testimony at the second termination trial. While she did get a substance abuse assessment in May 2023, she did so on her own terms, refusing to sign releases of information so that OCS could exchange collateral to provide the assessor important information about her history. And while she sought out a psychological assessment in February 2024, she similarly refused to allow an exchange of collateral information.[41] On other fronts, OCS repeatedly reached out to communicate with Adrienne in a variety of ways, attempted to assist her with visitation,

---

[40]     An OCS caseworker and supervisor testified to working on Adrienne's case between the two termination trials. The State admits there was a one-month assignment of a caseworker immediately after the first trial but says that Adrienne had no contact with her. Adrienne also cites to a different caseworker's initial assessment of Noah from May through July 2023 as proof of more turnover, but that caseworker's role was limited to determining whether Adrienne's third child was in need of aid, after which the caseworker and supervisor who had long worked on the older children's cases were assigned Noah's case as well.

[41]     In between these two assessments, Adrienne's caseworkers emphasized the impact that releases of information had on the success of her case. On one such occasion her response was to curse at the caseworker and hang up the phone.

-18-                                                                                                      *2141*

and referred her for UAs to demonstrate her sobriety. Adrienne failed to respond or engage with many of these efforts.

In *Amy M. v. State, Department of Health & Social Services, Office of Children's Services*,[42] we reviewed a case that was similar in several respects. There, OCS petitioned the superior court to terminate a mother's parental rights to her four children due to ongoing substance abuse.[43] The termination petition was filed three months after the birth of the mother's fourth child, and the superior court found that the efforts OCS made over its three years of involvement were reasonable in light of the mother's lack of engagement.[44] We affirmed the superior court's conclusion that OCS had made reasonable efforts: "The record show[ed] that OCS repeatedly urged [the mother] to get substance abuse treatment, but [she] was not willing to participate fully in treatment, and she would drop out of contact with OCS for months at a time."[45]

Here, as in *Amy M.*, the superior court heard ample evidence of the efforts made by OCS to encourage Adrienne's success, her continued refusal to engage with their recommendations, and her pattern of dropping out of contact altogether. In total, OCS worked with Adrienne over about six years, and the termination petition at issue was filed seven months after the birth of her most recent child. Thus, the timeline here provided even more opportunity for reunification efforts than in *Amy M*. OCS used this time to redouble its efforts, assigning two caseworkers in the 18 months between trials. And those caseworkers provided consistent, concurrent support, attempting to maintain contact and engage Adrienne with service providers.

Adrienne also claims that her contact with her older children was inhibited because their foster parent and aunt, Shantall, relocated to Texas with them. She argues

---

[42]    320 P.3d 253 (Alaska 2013).

[43]    *Id.* at 256-57.

[44]    *Id.* at 259-60.

[45]    *Id.* at 260.

that because OCS did not find a placement for them closer to Adrienne, OCS failed to make reasonable efforts. We observe that Adrienne made the same argument at trial, and the superior court concluded that because Adrienne's visitation was sporadic even when the children were in Alaska, the relocation did not undermine reasonable efforts. We agree. Shantall testified that at the start of 2023, she asked OCS to coordinate visitation with the older children, citing Adrienne's claimed difficulties in contacting her. Shortly after those visits started in March, OCS removed Adrienne from the visitation schedule due to missing two visits in a row. And in the year that followed — including about four months when the older children were in Alaska and eight months when they were in Texas — Adrienne did not attend any visitation with them despite repeated prompts by OCS. Indeed, in November 2023, OCS informed Adrienne that it would arrange to fly her to Texas to visit the older children, but she did not respond. She eventually started visitation again in April 2024, attending one visit and requesting a second. After she missed the second visit, however, she did not schedule another before the August termination trial.

Given the evidence of OCS's efforts over time, and Adrienne's minimal engagement with treatment and lack of cooperation with OCS, we see no error in the superior court's determination that OCS's overall efforts were reasonable.[46]

D.    **The Superior Court Did Not Clearly Err In Finding That Termination Of Adrienne's Parental Rights Was In The Children's Best Interests.**

When a superior court grants a petition to terminate parental rights, it must find by a preponderance of the evidence that termination is in the best interests of the child.[47] Although not explicitly defined in statute or rule, "guidance is found in

---

[46]    *See id.* at 259; *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432 (Alaska 2015).

[47]    *See* AS 47.10.088(c); CINA Rule 18(c)(3).

AS 47.10.088(b), which lists five factors 'relating to the best interests of the child.' "[48] These include "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs," "the amount of effort" the parent makes at remediation, "the harm caused to the child," "the likelihood that harmful conduct will continue," and the history of the parent's conduct.[49] These factors are not exhaustive or mandatory.[50] And courts need not give "a particular weight to any given factor."[51] When looking at best interests, "it is [also] proper to consider the children's bond to their caregivers, their need for permanency and stability, and the potential risk to the children if returned to their parent's care."[52]

Adrienne argues that in making its best interests finding, the superior court failed to account for her progress on her case plan and the trauma that the children would experience due to termination. Neither of these arguments is persuasive.

First, Adrienne characterizes her progress as steady improvement with minor setbacks. But as recounted above, the record shows that Adrienne had a history of sporadic communication and minimal engagement with both OCS and the treatment that would help her to safely parent her children. This failure to meaningfully engage with treatment, in the context of her history of relapses and missed UAs, undermines her arguments related to her progress.

Second, Adrienne cites an emotional outburst by her children that occurred when she missed a visitation, arguing that this is proof of the trauma that

---

[48] *Thea G. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 291 P.3d 957, 966 (Alaska 2013) (quoting AS 47.10.088(b)).

[49] AS 47.10.088(b).

[50] *Thea G.*, 291 P.3d at 966.

[51] *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1263 (Alaska 2010).

[52] *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 954 (Alaska 2013).

permanent separation would inflict.  But this event occurred about a year and a half before the termination trial, and regardless, does not in itself overcome the superior court's best interests analysis.[53]  Moreover, Shantall testified that the children were currently thriving in their placement with her.  She said that although they had emotional and social challenges when she first began caring for them, they had "made a complete turnaround."

Given this record, we see no clear error in the superior court's finding that termination of Adrienne's parental rights is in the children's best interests.

## V.    CONCLUSION

For the above reasons, we AFFIRM the superior court's termination order.

---

[53]    We addressed a similar argument in *Barbara P.*  There the mother argued that terminating parental rights would be traumatic for the child due to the parent-child bond, but we held that the court did not clearly err by giving weight to other considerations.  *Barbara P.*, 234 P.3d at 1263-64.